# **EXHIBIT A**

K. Andrew Kent, State Bar No. 130097
RINCON VENTURE LAW GROUP
2815 Townsgate Rd., Suite 215
Westlake Village, California  91361
Telephone: (805) 557-0580
Facsimile: (805) 557-0480

Alejandro P. Gutierrez, State Bar No. 107688
HATHAWAY, PERRETT, WEBSTER
POWERD, CHRISMAN & GUTIERREZ, APC
A Professional Corporation
5450 Telegraph Road, Suite 200
Ventura, CA 93006-3577
Telephone: (805) 644-7111
Facsimile: (805) 644-8269
agutierrez@hathawaylawfirm.com

Attorneys for Plaintiff
SUNLIGHT PRODUCT TECHNOLOGIES, LTD.

David P. King, State Bar No. 136765
Katharine A. Miller, State Bar No. 127131
KING, CHENG & MILLER LLP
201 South Lake Avenue, Suite 706
Pasadena, CA  91101
Telephone: (626) 304-9001
Facsimile: (626) 304-9002
dpk@kcmlaw.com

Attorneys for Plaintiff
DAVID JOSEPH BUNEVACZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF VENTURA

| | |
|---|---|
| SUNLIGHT PRODUCT TECHNOLOGIES, LTD., a Hong Kong Corporation, and DAVID JOSEPH BUNEVACZ, an individual,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>MPOWERD INC., a New York corporation, JACQUES PHILIPPE PIVERGER, and DOES 1 through 20, inclusive,<br><br>                    Defendants. | Case No. 56-2013-00444550-CU-BT-VTA<br><br>**SECOND AMENDED COMPLAINT for:**<br><br>**(1) Misappropriation of Trade Secrets under CAL-UTSA;**<br>**(2) Intentional Interference with Actual and Prospective Contractual Relations;**<br>**(3) Negligent Interference with Actual and Prospective Contractual Relations'**<br>**(4) Unfair Business Practices**<br>**(5) Declaratory Relief**<br><br>*Assigned for All Purposes to the Honorable Kent M. Kellegrew*<br><br>*Action filed November 6, 2013* |

---

1

SECOND AMENDED COMPLAINT

        Plaintiffs Sunlight Product Technologies, Ltd. ("Sunlight") and David Joseph Bunevacz ("Bunevacz")  for their Complaint against Defendants MpowerD Inc., Jacques Philippe Piverger, and Does 1 through 20 (collectively "Defendants") allege on knowledge as to themselves and on information and belief as to all other matters, as follows:

### COMMON ALLEGATIONS

        1.        Plaintiff Sunlight is a Hong Kong limited corporation engaged in the business of design and development of lighting products.  Plaintiff Bunevacz is an individual residing in Santa Clarita, California.  Non-parties Eli Probst and Todd Metlen are individuals who at all relevant times have resided in Ventura County, California.  Messrs. Probst and Metlen are founders, officers and directors of Plaintiff Sunlight.

        2.        On information and belief, Defendant MpowerD Inc. ("MpowerD") is a corporation organized under New York laws and having a place of business in New York, New York.  On information and belief, Defendant Piverger is an individual and has a residence in or near New York, New York.  At all relevant times, Piverger has been the chief executive officer of MpowerD.

        3.        Doe Defendants 1 through 20 are sued by fictitious names because their identities and capacities, whether individual, corporate, associate or otherwise, have yet to be sufficiently determined by Plaintiff.  On information and belief, Does 1 through 20 are persons or entities who otherwise have been affiliated with MpowerD in some manner, and each has either direct, contributory or vicarious liability for the wrongful acts alleged below.

        4.        On information and belief, at all relevant times, each of the Defendants was the agent of each of the remaining Defendants, and in doing the things alleged herein, was acting within the scope of such agency.  On information and belief, the conduct of each of the Defendants as alleged herein was ratified by each of the other Defendants, and the benefits thereof were accepted by each of the other Defendants.

        5.        On information and belief, each of the Defendants induced the other Defendants to violate Plaintiffs' rights, participated in, aided, abetted and enabled the other Defendants to engage in the unlawful conduct herein alleged, or supervised that conduct, with knowledge that the conduct of the other Defendants would violate Plaintiffs' rights, and constitute tortious

---

conduct and unfair competition.  Therefore each of the Defendants is jointly and severally liable for the wrongful acts alleged below.

6.      Messrs. Probst and Metlen are inventors and consumer products designers.  In 2010, they founded Blue Ox Industrial Co., Ltd as a vehicle to combine their established careers and talents in product design, development and manufacturing.  Their combined experience includes researching, developing, innovating and designing hundreds of inventions, many of which have resulted in United States and international utility and design patents.  Their inventions have been licensed or sold to leading national and international retailers and manufacturers, who have in turn incorporated Metlen and Probst inventions into consumer products that have seen commercial and critical success.  Their inventions can be found in products sold at the retail level by Apple Store, Best Buy, REI, Sears, Guitar Center, Amazon, Target, Radio Shack, Fry's Electronics, Walmart, True Value Hardware, Do It Best Hardware, Batteries Plus, Sweetwater, Newegg, Frontgate, HSN, QVC and others.

7.      Plaintiff Bunevacz is a California businessman who resided in Hong Kong and other Asian cities for over 14 years, and who has maintained strong business and family relationships there since returning to the United States.  During his tenure in Asia, Bunevacz built over the course of a three-year period a state of the art automated manufacturing facility that began producing non-flammable advanced micro-electronic devices sold as electronic cigarettes in 2005.  Through a corporation he founded, Holy Smokes USA LLC, he has become one of the largest importers of custom e-cigarettes in the United States.   Mr. Bunevacz's Holy Smokes business has expanded into the design, manufacture and production of other consumer products.  Examples include several different types of vaporizers now produced by Mr. Bunevacz, among them a sales leader for multi-use vaporizers in the United States, and a soon-to-be launched vaporizer that is expected to be the most advanced product of its kind on the market.

8.      In or about the Fall of 2012, Mr. Metlen had a chance encounter with Joseph Bunevacz, who is the father of Plaintiff David Joseph Bunevacz.  The elder Bunevacz informed Metlen that he was on his way to China to assist his son in working through production issues for a lighting product at his son's manufacturing facilities in China.  Mr. Metlen suggested he and Probst might be able to help the Bunevaczs with the production issues.  Thereafter, Metlen and

Probst inspected a prototype provided by Plaintiff Bunevacz, made improvement suggestions and helped produce a batch of solar light units for a promotional event.

9.      In or about late 2012, Messrs. Probst and Metlen advised Plaintiff David Bunevacz that they believed they could design and innovate a superior lighting product compared to what he had previously produced.  With Bunevacz's expression of interest in doing business with them, Probst and Metlen developed designs for a solar powered, inflatable, waterproof lantern product having a novel interior structure and other unique and superior features. They provided Bunevacz with design drawings, renderings and other technical information concerning their innovative product, with the understanding and expectation that this information would be treated in a confidential manner by Mr. Bunevacz in reviewing it for purposes of doing business with them and in turn soliciting proposed customers.

10.     On information and belief, in or about 2012, Defendant MpowerD was a start-up company that had sought to enter the market for lighting products.  During 2012, Bunevacz had manufactured and produced lighting products to MpowerD.  In or about late 2012, Bunevacz attempted to secure MpowerD's interest in becoming a wholesale customer and/or distributor for the innovative lantern product developed by Messrs. Probst and Metlen.  In soliciting MpowerD's interest in becoming a wholesaler and/or distributor for that innovative product, Bunevacz conveyed to Defendants MpowerD and Piverger CAD drawings, renderings, and technical information developed by Metlen and Probst ("Proprietary Lantern Information"). Bunevacz conveyed this information privately, under circumstances supporting a reasonable expectation that the Proprietary Lantern Information would be treated in a confidential manner by MpowerD and Piverger and be reviewed and used for the limited purpose of considering a business relationship whereby MpowerD would become a wholesaler and/or distributor for innovative lanterns produced from the Proprietary Lantern Information.

11.     On information and belief, in 2013, Piverger acknowledged the significance of the innovations developed by Metlen and Probst, as reflected in the Proprietary Lantern Information, and their ownership by Metlen and Probst.  On behalf of MpowerD, he offered to engage in a transaction that would have allowed MpowerD to participate in the commercialization of lantern products based on the Proprietary Lantern Information, but the offer was inadequate and declined by Metlen and Probst.  On information and belief, after learning that Probst and Metlen declined

MpowerD's offer, Defendants MpowerD and Piverger attempted to secretly, without authorization, make commercial use of the Proprietary Lantern Information.  On information and belief, MpowerD and Piverger provided the Proprietary Lantern Information to an overseas manufacturer, through which they have attempted to make (or have made for them) products that incorporate and use the Proprietary Lantern Information.

12.     In July 2013, Messrs. Probst and Metlen formed Sunlight Technologies as a company whose purpose was to commercialize their lantern innovations.  Probst and Metlen thereupon assigned to Sunlight their rights in and to the Proprietary Lantern Information and in any inventions they had developed relating to that information.  Plaintiff Bunevacz has also assigned to Sunlight any patent, inventorship or creative rights that may have vested in him relating to lantern improvements.

## FIRST CAUSE OF ACTION

(Misappropriation of Trade Secrets; Cal. Civ. Code § 3426 et seq.; Sunlight against all Defendants)

13.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 12 above, as if stated here in full.

14.     The Proprietary Lantern Information at all relevant times derived actual or potential independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

15.     The Proprietary Lantern Information has been the subject of reasonable efforts by Metlen, Probst, and Sunlight to maintain its secrecy.

16.     Some or all of the Proprietary Lantern Information constituted trade secrets ("Lantern Trade Secrets") within the meaning of California Civil Code Section 3426.1.

17.     Ownership of the information constituting Lantern Trade Secrets has been assigned to Sunlight.

18.     On information and belief, MpowerD and Piverger, and Does 1 through 20 acquired the Lantern Trade Secrets knowing or having reason to know that they had been acquired by improper means.

19.      On information and belief, MpowerD and Piverger and Does 1 through 20 disclosed or used the Lantern Trade Secrets without express or implied consent for the use or

disclosure, after using improper means to acquire knowledge of the Lantern Trade Secrets.

20.      On information and belief, MpowerD and Piverger and Does 1 through 20 disclosed or used the Lantern Trade Secrets without express or implied consent for the use or disclosure, despite knowing or having reason to know at the time of that disclosure or use that its, his, or their knowledge of the Lantern Trade Secrets had derived from or through improper means of acquiring them, or derived from or through a duty to maintain their secrecy or limit their use and disclosure.

21.      On information and belief, MpowerD and Piverger and Does 1 through 20 disclosed or used the Lantern Trade Secrets without express or implied consent for that use or disclosure, before the occurrence of a material change in its, his, or their position, while knowing or having reason to know the Lantern Trade Secrets were trade secrets and that its, his, or their knowledge of them had been acquired by accident or mistake.

22.      On information and belief, MpowerD and Piverger and Does 1 through 20 misappropriated the Lantern Trade Secrets.  On information and belief, their misappropriation was willful and malicious.

23.      On information and belief, defendants have caused damage to Sunlight as a direct and proximate result of their acts of misappropriation, in an amount to be proven at trial.  On information and belief, defendants have profited from their acts of misappropriation, in amounts to be proven at trial.  On information and belief, defendants have been unjustly enriched as a result of their acts of misappropriation.  On information and belief, defendants have obtained commercial advantage derived from their acts of misappropriation.

24.      On information and belief, MpowerD and Piverger and Does 1 through 20 threaten to misappropriate the Lantern Trade Secrets, or threaten to further misappropriate them, continue their misappropriation or extend their misappropriation, all within the meaning of California Civil Code Section 3426.2.  Provisional, temporary, preliminary and final injunctive relief is necessary to stop and prevent Defendants' actual or threatened misappropriation of the Lantern Trade Secrets, and eliminate the commercial advantage defendants derived from misappropriating them.

## SECOND CAUSE OF ACTION

(Intentional Interference with Actual and Prospective Business Relations; Sunlight against all Defendants)

25.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 12 above as if set forth in full.

26.     On information and belief and as further alleged below, Defendants have willfully sought to disrupt, and have in fact, disrupted both existing and prospective customer relationships Sunlight developed for the marketing and sale of Sunlight's inflatable, water-proof, solar-powered lantern products.  Defendants' disruptive conduct has been carried out through a series of false representations Mpowerd made by direct contact to Sunlight customers concerning verifiable facts Mpowered actually knew were untrue, deceptive and misleading.  Sunlight has yet to discover all of Mpowerd's communications to Sunlight's actual and prospective customers, but as currently known to Sunlight, the false, deceptive and misleading representations by Mpowerd were made to the following entities:  World Luminous Inc. ("WLI"), MMD Distribution, and Amazon.com.

27.     Attached hereto as Exhibit A is a true copy of an email from MMD Distribution, reporting that it received a telephone call from "John Salzinger of M-Powerd with a serious threat of leagal [sic] action against MMD for selling counterfeit [sic] goods."  MMD said it was "shocked" by what Salzinger told it and and a result MMD cancelled its orders with Sunlight.

28.     Attached hereto as Exhibit B is a true copy of an email from WLI, attaching a letter from a representative of Mpowerd.  Although the Mpowerd letter is not fully legible, a portion that is legible shows an Mpowerd representation that Sunlight lanterns were created from "confidential and proprietary information" of Mpowerd and attempting to dissuade WLI from exhibiting any Sunlight lantern products at the January 2014 Consumer Electronics Show in Las Vegas, Nevada.  At the time of its receipt of Mpowerd's communications, WLI had agreed to market Sunlight's products at the Consumer Electronics Show, and was prepared to market Sunlight's products through QVC, through a well-known consumer product pitchman, and through other marketing channels.  Instead, WLI terminated its relationship with Sunlight.

29.     On information and belief, in or around May 2014, Mpowerd executives or representatives knowingly communicated false and deceptive information to the online retailer Amazon.com, stating that Sunlight's lantern products were counterfeit.  At the time, Sunlight listed and sold products through the Amazon website. On information and belief, after receiving Mpowerd's knowingly false communications, Amazon.com delisted all of Sunlight's products and has refused to re-list Sunlight's products until a court order provides otherwise.  Sunlight has asked Amazon.com to provide it with all information Mpowerd communicated to it in representing to Amazon.com that Sunlight's products were "counterfeit."  Amazon.com has declined, stating that its communications with Mpowerd were confidential and private.  On information and belief, attached hereto as Exhibit C is a true copy of a communication sent by an Mpowerd executive or representative named John Remson concerning Sunlight's lantern product.  This letter communicates information Mpowerd knew was false, misleading, and refuted in Mpowerd's own records, as further alleged below.  On information and belief, this false and deceptive information was among the information Mpowerd communicated to Amazon.com with actual knowledge that it was false, deceptive and refuted in Mpowerd's own records.  On information and belief, in or about January 2014, Mpowerd posted an online "Ripoff Report."  An executive or representative of Mpowered, identified only as "John," stated that "Sunlight lantern is violating IP rights owned by MPOWERD, Inc.  MPOWERD holds a patent on this design of an inflatable solar lantern and the Sunlight lantern is a blatant knock off of the design."  On information and belief Mpowerd's communications to Sunlight's customers contained knowing, false and deceptive statements suggesting Sunlight's products were "counterfeit" copies of Mpowerd products.

30.     On information and belief, the following facts were known to Mpowerd executives and representatives at the time of each of the communications alleged in the foregoing paragraph.  Mpowerd's  knowledge of these facts shows its communications were willfully false and deceptive:

(a).     On or about June 25, 2013, Mpowerd filed an application for a utility patent with

the Unted States Patent and Trademark Office (USPTO), for an inflatable, solar powered lamp.  That application ("Luci Lantern Application") was published in the USPTO's application viewing system on May 1, 2014.  As of the current date, the USPTO has not issued any patent to Mpowerd, and has not even determined that it will allow any of the patent claims that were made in the Luci Lantern Application.  A true copy of the Luci Lantern Application, as published by the USPTO's PAIR viewing system, is attached hereto as Exhibit D.

(b).     The fact of its filing of the Luci Lantern Application was used by Mpowerd to make knowingly false and misleading communications to Sunlight's customers and potential customers suggesting that Sunlight's lantern products were "counterfeit" copies of intellectual property that was owned by Mpowerd by virtue of a grant of rights by the United States government, when that was not the case.

(c).     The claims that Mpowerd wrote into the Luci Lantern Application were inventions its executives actually knew had been developed by the individual inventors Todd Metlen, Eli Probst, and David Bunevacz.  Mpowerd in fact knew this from its own prior course of dealings with these individuals and from its own internal records of those dealings.   In a May 14, 2013 email, Defendant Piverger stated that Mpowerd planned to file for patent protection for the lantern product it was calling the "Luci."  In that same email, Piverger expressly acknowledged that Todd Metlen, Eli Probst and David Bunevacz were "inventors' of the Luci lantern and requested that they each assign over to Mpowerd all their rights of inventorship in the Luci lantern.  Piverger also acknowledged that these individual inventors had not, as of that date, assigned their "rights of inventorship" in the Luci lantern to Mpowerd.  Piverger also knew that Metlen, Probst and Bunevacz were not employees of Mpowerd (indeed Mpowered was not even incorporated).  In addition, Piverger knew that Mpowerd did not have any agreement with any of Metlen, Probst or Bunevacz providing for the assignment to Mpowerd of any "rights of invention in the Luci lantern.  A true copy of that email is attached hereto as Exhibit E.  Messrs. Metlen, Probst and Bunevacz did not in May 2013 or at any later time

---

9

SECOND AMENDED COMPLAINT

assign their "rights of inventorship" in the Luci lantern to Mpowerd;

(d).     The Luci Lantern Application includes technical drawings of the inventions claimed by Mpowerd.  Mpowerd knew these very technical drawings were copied from the drawings that Todd Metlen and Eli Probst supplied to Mpowerd and Bunevacz in 2012.  Mpowerd knew Metlen and Probst had never agreed to not use their own technical drawings to make inflatable solar powered lanterns for themselves or for any company, such as Sunlight, they might later own or affiliate with.  The inclusion, without authorization by Metlen and Probst, of their technical drawings in Mpowerd's patent application independently constitutes inequitable conduct under rules of practice and procedure applicable to the USPTO that would prevent Mpowerd from enforcing any patent that might ultimately issue.

(e).     Applications for a patent filed with the USPTO are required to truthfully disclose each inventor of every invention upon which the patent claims are based. Mpowerd filed the Luci Lantern Application, but knowingly omitted the disclosure of Todd Metlen, Eli Probst, and David Bunevacz.  If the inventor list is not corrected prior to publication of the patent application, this independently constitutes inequitable conduct under established rules of practice and procedure applicable to the USPTO that would prevent Mpowerd from enforcing any patent.

(f).     Instead of listing Metlen, Probst and Bunevacz on the inventor disclosure as originally contemplated by Defendant Piverger, Mpowerd listed only Jason Alan Snyder as the inventor of all inventions claimed in the Luci Lantern Application.  Left uncorrected at the time of publication of the Luci Lantern Application, this, too, independently constituted inequitable conduct under established rules of practice and procedure for the USPTO.  Attached hereto as Exhibit F are true copies of contemporaneous communications in early- to mid-2012, among Bunevacz, Piverger, Gunderson, Salzinger and Snyder.  Mpowerd had not been formed at that time, and all of these individuals were communicating in a loose association of individuals interested in doing business together, with the hope a product they could market and sell would be

developed (hereinafter "Mpowerd Group").  As reflected in this exhibit, Piverger and Gunderson wanted to copy a third party product, the "Solar Puff," and Gunderson sent a picture of the Solar Puff to Bunevacz as an example of what he wants to copy.  Piverger had previously worked with Alice Chun, the inventor of the "Solar Puff," and this is how he got the idea to copy her product without her knowledge or permission.  For his part, Snyder wanted to copy a different third party's product:  the Project Soul Cell product.  On April 27, 2012, Snyder wrote to Bunevacz about the Project Soul Cell product, which he called a "glorious" design.  Snyder also acknowledged that Bunevacz was peforming the actual product design and development for the group.  However, as reflected in Exhibit F, Bunevacz was the individual who was devoting his own time and expense, in China, attempting to develop a commercial lantern product.  As communicated among members of the Mpowerd Group, the ideas of Snyder, Gunderson, Salzinger and Piverger were not practical, cost-effective, durable replicable for manufacturing purposes.  Bunevacz took the Mpowerd Group in the direction of a design alternative, using a cylindrical shape and PVC materials that were readily collapsible, inflatable and water-proof.

(g).    The Mpowerd Group were not engineers and lacked lighting design and development expertise.  The solar powered lighting assemblies used in early stage"Luci" lantern prototypes looked much like the third party Solar Puff assembly. Through Bunevacz, the Mpowerd Group was put in touch with Todd Metlen and Eli Probst in 2012.  Since many years prior to 2012, Metlen and Probst had extensive experience designing and engineering the use of solar-power as well as LED technology in commercial products.  They had the technical expertise necessary for mass production of a superior and reliable consumer lighting product.  Prior to the time of the alleged wrongful interference, Mpowerd was fully aware of the background and expertise of Metlen and Probst.  Mpowerd was fully aware that Metlen and Probst were not strangers or counterfeiters but rather had shown the Mpowerd Group how to reconfigure the lighting components of an inflatable solar powered lamp or lantern product, in an innovative embodiment that produced long-lasting, bright, energy efficient light.

Records documenting the sharing of expertise and know-how, from Metlen and Probst to the Mpowerd Group have previously been served on Defendants.

(h)    In a June 18, 2013 email, Piverger stated to Bunevacz that Mpowerd wanted to represent to the public that it was an innovative company that did its own design and development even though it did not in fact innovate internally but rather was selling product that had been designed and developed by the external efforts of Todd Metlen and Eli Probst (whose design-development firm was Blue Ox Industrial), in addition to David Bunevacz.  A true copy of that email is attached as Exhibit G.  Out of an abundance of caution, portions of the email relating to pricing and/or financial details have been redacted from this exhibit as filed in the public record, but Defendants have an unredacted copy supplied to them previously by Plaintiff Sunlight, and an unredacted copy will be submitted under seal if requested by the Court.

(i)    At the time of its communications to Sunlight's customers as alleged above, Mpowerd knew Sunlight's own products were based on product designs developed and engineered by Todd Metlen, Eli Probst and David Bunevacz.  Mpowerd also knew that, despite Mpowerd's efforts to negotiate for a transfer and assignment of their rights of inventorship in those designs, this never occurred.   Mpowerd also knew that Sunlight's products were not "countfeits" at all, but rather were lantern products that were derived from the experience and expertise of Metlen and Probst.

(j).    At the time of its communications to Sunlight's customers as alleged above, Mpowerd knew it did not have an enforceable patent granted to it for any lantern invention as against lantern products offered for sale by Sunlight in the United States, Canada or Europe.  Mpowerd also knew it did not have a registered copyright upon which it could assert copyright infringement against Sunlight.  Although Mpowerd may have acquired trademark rights for the trademark "Luci" for inflatable solar powered lamps, Mpowerd also knew that Sunlight was not packaging or marking any lamp or

lantern product with the trademark or logo "Luci."  Nevertheless, Mpowerd knowingly and deceptively told Sunlight's customers that Sunlight's products were counterfeit, re-

_____

branded "Luci" products.

(k).     Mpowerd's communications to Sunlight's customers, and its"Ripoff Report" were perpetrated to cover up the fact that Mpowerd was not an innovative company that had developed its own products in-house.  To the public, to customers, and to potential investors, Mpowerd tried to create the façade that the company was at its core a product innovator.  The reality was that, at its core, Mpowerd was formed by individuals whose experience and focus was marketing, promotion, advertising, sales and recruiting funding.  Mpowerd merely obtained for re-sale private-labeled products that were not designed or developed in-house.  To cover up this reality, Mpowerd maliciously sought to prevent Metlen and Probst from marketing and distributing through Sunlight a solar-powered lantern product based on their own know-how and innovations.

31.     By their conduct, either directly or through concert or conspiracy, Defendants have intentionally disrupted or interfered with Sunlight's actual and prospective customer relationships as described above.

32.     As a direct and proximate consequence of the conduct alleged herein Plaintiffs have each suffered tort damages in an amount to be proven at trial.

33.     The conduct of the defendants was malicious, oppressive, and despicable, sufficient to support an award of punitive damages.

### THIRD CAUSE OF ACTION

(Negligent Interference with Actual Contractual Relations; Plaintiff Sunlight against all Defendants)

34.     Sunlight incorporates by reference the allegations of Paragraphs 1 through 12 and 25 through 33 above as if set forth in full.

35.     Defendants' conduct as described above, either directly or in concert or conspiracy, did in fact interfere in the actual contractual relations between Sunlight and the Sunlight customers described above.  This interference was the result of inequitable conduct, whose damaging impact on Sunlight's actual relations with its customers was reasonably

---

foreseeable.

36.     As a direct and proximate consequence of the conduct alleged herein, Sunlight has suffered tort damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

(Violation of Cal. Bus. & Prof. Code § 17200 et seq.; Plaintiff Sunlight against all Defendants)

37.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 12 and 26 through 33 above as if set forth in full.

38.     On information and belief, defendants' actions as described above constitute an "unlawful, unfair or fraudulent" business act or practice within the meaning of California Business & Professions Code Section 17200 et seq.

39.     On information and belief, Plaintiffs lost money or property, and defendants unjustly obtained money, property or other material benefit, as a direct and proximate result of defendants' unlawful, unfair and fraudulent practices.

40.     Defendants have engaged, are engaging, and propose to engage in unfair competition.

41.     Plaintiffs are entitled to injunctive relief as against defendants' acts of unfair competition.

## FIFTH CAUSE OF ACTION

(Declaratory Relief; Sunlight and Bunvacz; against MPowerD)

42.     Sunlight incorporates by reference the allegations of Paragraphs 1 through 41 above as if set forth in full.

43.     In 2012, Plaintiff Bunevacz's brother in law, Steve Gunderson, contacted him in California.  He told Bunevacz he was an investor in a start-up company, Mpowerd, Inc., that was seeking to enter the wholesale market for lighting products.  At the time, however, Mpowerd had not been formed as an entity.  It was merely an association of individuals (the Mpowerd Group, as previously alleged).  Gunderson said he was looking for a manufacturer that could, through reverse engineering, produce a knock-off of a popular off-the-shelf solar lighting product sold in the retail marketplace by a competitor.  Mr. Gunderson was aware of Bunevacz's successful commercial manufacturing ventures, facilities and relationships in China, and explained that

MpowerD wanted to contract with him to produce the reverse-engineered knock-off product. Afterward, Defendant Piverger contacted Bunevacz in California about the proposed manufacturing and production contract for MpowerD, and sent to Bunevacz in California a Production Contractor Agreement MpowerD had prepared, for counter-signature.  In or about August 2012, Bunevacz counter-signed the Production Contractor Agreement in California, and from California sent it back to Mr. Piverger in New York.  A true and correct copy of the Production Contactor Agreement is attached hereto as Exhibit H.  In or about March 2013, the Production Contractor Agreement was amended in a document similarly prepared by MpowerdD.  A true and correct copy of the amended Production Contractor Agreement is attached hereto as Exhibit 2.

44.     In or about early July 2013, Mr. Bunevacz formally terminated the Production Contractor Agreement.

45.     Paragraph 13 of the Production Contractor Agreement states that the agreement would be governed by, construed and enforced in accordance with California law.  Paragraph 7 and 8 of the Production Contractor Agreement (titled "Covenant Not To Compete") state:

> "*The Contractor he re by agrees that during the course of the Agreement and for a period of twenty four months immediately following the expiration or termination of the Agreement for any reason, whether with or without good cause or for any or no cause, at the option either of the Company or the Independent Contractor, with or without notice, the Independent Contractor will not compete with the Company and its successors and assigns, without the prior written consent of the Company, The term "not compete" as used herein shall mean that the Independent Contractor shall Not, without the prior written consent of the Company, (i) serve as a partner, employee, Company, officer, director, manager, agent, associate, investor, or otherwise for, (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (Hi) build, design, finance,*

---

*acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate with, any business in competition with or otherwise similar to the Company's business.  This shall cover the Independent Contractor's activities in every part of the Territory in which the Independent Contractor may conduct business during the term of the Agreement as set forth above. Territory\* shall mean (i) all counties in the State of New York, (ii) all other states of the United States of America and (iii) all other countries of the world; provided that, with respect to clauses (ii) and (iii) in this paragraph, the Company derives at least five percent (5%) of its gross revenues from such geographic area prior to the date of the expiration or termination of the Agreement. The Independent Contractor further acknowledges the time, geographic, and scope limitations of his or her obligations are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that he or she will not be precluded from gainful employment if he or she is obligated not to compete with the Company during the   period and within the Territory.*

*"8, Right to Injunction.*

*8.1 The parties hereto acknowledge that the services to be rendered by the Contractor under this Agreement and the rights and privileges granted to the Company under the Agreement are of a special, unique, unusual, and extraordinary character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in any action at law, and the breach by the Contractor of any of the provisions of this Agreement will cause the Company irreparable injury and damage. The Contractor expressly agrees that the Company shall be entitled to injunctive and other equitable relief in the event of, or to prevent, a breach of any provision of this Agreement by the Contractor. Resort to such equitable relief, however, shall not be construed to be a waiver of any other rights or remedies that the Company may have for damages or otherwise. The various rights and remedies of the Company under this Agreement or otherwise shall be construed to be cumulative, and no one of the them shall be exclusive of any other or of any right or remedy allowed by law."*

46.     On information and belief, Paragraph 7 of the Production Contractor Agreement, and Paragraph 8 of that agreement to the extent it purports to provide for injunctive relief to enforce a non-compete provision, are void and unenforceable under California Business & Professions Code Section 16600 and applicable case law.  On information and belief, MpowerD and Piverger are attempting to enforce these provisions, to coerce Sunlight and Bunevacz not to engage in free, open and lawful business relations consistent with fundamental public policies embodied in Section 16600 and the case law.  Sunlight has been interested in doing business with Bunevacz, a California resident, in connection with its business activities in California in the lighting industry and in other fields.   Mpowerd and Piverger assert Sunlight cannot do business with Mr.Bunevacz because that would purportedly "violate the non-compete" provision of the terminated Production Contractor Agreement.

47.     Section 1060 of the California Code of Civil Procedure provides in part that "Any person interested … under a contract, or who desires a declaration of his or her rights or duties with respect to another … may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the … contract. He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time."

58.     An actual controversy exists between Sunlight and Bunevacz on the one hand, and MpowerD on the other, as to the following issues, among others:

- Whether  a "covenant to not compete" that Mpowerd wrote into the

---

17

SECOND AMENDED COMPLAINT

Production Contractor Agreement is void and unenforceable, as against Sunlight as employer of Bunevacz, and Bunevacz as employee, in light of California's strong public policy disfavoring such covenants, or if any part of it is not void, whether it must be given a limited and narrow construction.

- Whether the Production Contractor Agreement is void and unenforceable as a whole because of its inclusion of unlawful non-compete provisions.

- Whether and to what extent the Production Contactor Agreement had any effect after its June 2013 termination.

49.     The Court should issue a declaration that the "covenant not to compete" provision that Mpowerd wrote into Paragraph 7 of the Production Contractor Agreement (together with any injunctive enabling provision in Paragraph 8) is void and unenforceable and that the entirety of the Production Contractor Agreement must be declared invalid.

50.     In addition, the Court should declare that Defendants have no right to assert, as they did in communications to Sunlight's customers, that Sunlight's products are "counterfeit" or other unlawful re-branding or copying of an Mpowered "Luci" lantern product.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against defendants as follows:

1.     That Sunlight be awarded damages for Defendants' misappropriation of the Lantern Trade Secrets, in an amount to be proven at trial;

2.     That Sunlight be awarded Defendants' profits and other unjust enrichment from their misappropriation of the Lantern Trade Secrets, in an amount to be proven at trial.

3.     That Sunlight be awarded a reasonable royalty pursuant to California Civil Code Section 3426.3(b).

4.     That the Court award exemplary damages to Sunlight and against Defendants

under California Civil Code Section 3426.3(c).

5.      That provisional, temporary, preliminary and final injunctive relief be issued against Defendants preventing them from using the Lantern Trade Secrets or otherwise obtaining commercial advantage derived from their misappropriation of the Lantern Trade Secrets;

6.      That Plaintiffs be awarded consequential damages for Defendants' intentional interference with their actual and prospective contractual relations.

7.      That Plaintiffs be awarded consequential damages for Defendants' negligent interference with their actual and prospective contractual relations.

8.      That Defendants be ordered to disgorge all unlawfully gained benefits, and restore to Plaintiffs all money and property acquired by them, as a result of their acts of unfair competition;

9.      That provisional, temporary, preliminary and final injunctive relief be issued against Defendants under Business & Professions Code Section 17203, preventing them from continuing their practices constituting unfair competition and requiring that they take such affirmative actions as will correct and prevent continuing damage caused by the false and deceptive communications Defendants made to Sunlight customers asserting that Sunlight's products were "counterfeit";

10.     That the Court declare the "Covenant to not Compete" written into the Production Agreement and the entirety of the Production Contractor Agreement void and unenforceable.

11.     Court should declare that Defendants have no right to assert, as they did in communications to Sunlight's customers, that Sunlight's products are "counterfeit" or other unlawful re-branding or copying of an Mpowered "Luci" lantern product.

12.     That the Court award Plaintiffs their reasonable attorneys' fees and costs as provided by applicable statutory law; and

13.     That the Court award Plaintiffs such further relief as the Court deems just and proper.

1

2

Respectfully submitted,

3   Dated: December 9, 2014

4

5

RINCON VENTURE LAW GROUP

6

By_____

7   K. Andrew Kent
    Attorneys for Plaintiff Sunlight Product

8   Technologies, Ltd.

9

10   KING, CHENG & MILLER, LLP

11

12   By_____
     David P. King

13   Attorneys for Plaintiff David Joseph Bunevacz

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

SECOND AMENDED COMPLAINT

PROOF OF SERVICE

STATE OF CALIFORNIA)
COUNTY OF VENTURA)

I am employed in the County of Ventura, State of California.  I am over the age of eighteen (18) years, and not a party to the within action.  My business address is 2815 Townsgate Road, Suite 215, Westlake Village, CA 91361.

On December 9, 2014, I served the foregoing document, **SECOND AMENDED COMPLAINT,** [Pursuant to CCP § 2019.210]**,** on the interested parties in said action addressed as follows:

| | |
|---|---|
| James C. Otteson, Esq. | David P. King, Esq. |
| Brandon D. Baum, Esq. | KING, CHENG & MILLER, LLP |
| AGILITY IP LAW, LLP | 201 South Lake Ave., Suite 706 |
| 149 commonwealth Drive | Pasadena, CA  91101 |
| Menlo Park, CA 94025 | |

**(BY MAIL)** I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Westlake Village, California in the ordinary course of business.

X   **(VIA E-MAIL)** brandon@agililtyiplaw.com; dpk@kcmlaw.net
Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person(s) at the e-mail address(es) so indicated above.  I did not receive, within a reasonable time after the transmission, any electronic message, or other indication that the transmission was unsuccessful.

**(VIA OVERNIGHT MAIL)**  by using express mail service and causing to be delivered overnight next day delivery a true copy thereof to the person(s) at the address set forth above.

**(PERSONAL SERVICE)**  I caused such envelope to be delivered by hand to the offices of the addressee, by recognized messenger service whose additional proof of service will be filed after its receipt by our office.

**(State)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 9th day of December 2014, at Westlake Village, California.

_____
Adriene Harris

SECOND AMENDED COMPLAINT

us to protect the sensitive nature of that information.

But, let me offer something even better – I'll put my money where my mouth is. We would be willing to sign a distribution agreement with you that includes an indemnity clause, in which Sunlight agrees to defend you in the event any legal action is taken against you regarding rights to the product. This way, you can rest assured that in the *extremely unlikely* event that there is any legal action attempted by Mpowerd, we will take full responsibility (financial and otherwise) for defending you. Make sense?

Truly, you have nothing to worry about and we don't want this to be a distraction for you. I look forward to your thoughts.

Kind Regards,

Eli

---

**From:** Nick Tulloch [mailto:nicktulloch@mmddistribution.com]
**Sent:** Wednesday, July 31, 2013 9:25 AM
**To:** david@hskconsultants.com; Eli Probst
**Subject:** Sun Lanterns

David and Eli,

I have just received a call from John Salzinger of M-Powerd with a serious threat of leagal action against MMD for selling counterfiet goods.

This news is quite shocking and I would suggest you urgently forward me information explaining exactly what is going on.

Thank you,
Nick


--
<image001.jpg>
No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.3392 / Virus Database: 3209/6538 - Release Date: 07/31/13
No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.3392 / Virus Database: 3209/6538 - Release Date: 07/31/13


--

**EXHIBIT A**

**Friday, September 19, 2014 at 3:32:58 PM Pacific Daylight Time**

**Subject:** Fwd: Legal Warning Notice received today - from MPowerd attorneys
**Date:** Thursday, December 12, 2013 at 9:46:26 PM Pacific Standard Time
**From:** David
**To:** eli@blueoxindustrial.com

Sent from my iPhone

Begin forwarded message:

> **From:** dumontdesiree@aol.com
> **Date:** December 12, 2013 at 8:27:59 PM PST
> **To:** davidmeir54@gmail.com, dave@hskconsultants.com, rodneyfingleson@gmail.com, efingleson@gmail.com, wittman.margaret@gmail.com
> **Subject:** Legal  Warning Notice received today - from MPowerd attorneys

> Team

> Please attempt to read the attached legal notice that Rodney received today...unfortunately his puppy chewed up this document...I've attempted to paste it together with tape but there is much missing.  The letter is written to David Meir, so I suggest that David reaches out to the law firm in NY whom sent this and obtain an electronic copy of the notice - warning letter.

> In essence, the letter is a cease letter - to cease all activities on behalf of Sunlight Lantern and with David Bunevacz....it insists that we withdraw and do not appear with the lantern at the upcoming CES show.  They must have seen us listed as "Sunlight Lantern" - and the only way they could do this is by getting pre-access to registered exhibitors...I have a hunch you need to be an exhibitor to get access to this list but I could be wrong here.

> The letter continues on that we are "on notice" not to destroy, conceal or alter any paper or electronic files due to the potential for litigation & court orders.

> We need to take this letter seriously - and we don't have any budget for legal, so I'm not sure what to do here - use the lawyer that David B is using (that filed a suit against MPowerd?)

> Lets discuss this first thing in the morning.  I might have a call with our QVC rep at 8:30 and booked until 10:30 - we are meeting with Jon Nokes at 10:30am - 12pm.

> Please feel free to give me a call tonight.

> Thanks so much

> Des



New York
885 Third Avenue, 30th Floor
New York, NY 10022-4834
Tel: 212.209.3050
Fax: 212.371.5500

Princeton
5 Vaughn Drive
Princeton, NJ 08540-6313
Tel: 609.514.1500
Fax: 609.514.1501

www.reitlerlaw.com

December 10, 2013

Via Federal Express
Mr. David Meir



**EXHIBIT B**



President
World Luminous Inc.
4256 Vicasa Drive
Calab——

Re:      Lantern Consultant Electronics Show

Dear Mr. Mei

We regret that World Luminous Inc. ("Worldwide Luminous Inc.") has recently produced... (the "Lantern") and/or in... we request that Worldwide ... and desist any and all efforts to sell or promote the Sunlight Pro Technologies Co., Ltd. ("Sunlight Ltd.") and/or Blue Om Industrial Co...

... has come to th... ...on that Worldwide is listed as one of the exhibitors at the Consumer Electronics ... in ... Case, Nevada in January 2014. According to the exhibitor ... Worldwide ... him ... its Sunlight Lantern. Sunlight Lantern is also the name of the ... ...ing, and Mr. ... One of the owners of Sunlight Ltd. is David Bunevacz. ... Company serv... ...sly introduced you to the Company in connection ... 2013 all-p... ...t the Luci lant...m. Moreover, Worldwide was incorporated ... ...e 9 that attempted introduction. Thus it appears that Worldwide intends to ... ...nd/or sell the Sunlight Lantern on behalf of Sunlight Ltd. If this ... Worldwide ... ...se disregard this letter. Otherwise we reiterate our demand that ... on any such activities.

You may not b... Sunlight ... and David Bu... lantern for th... ...e Company and not use ...re of the dispute between the Company, on the one hand, and ...nevacz, on the other. Pursuant to a contract between the Company ...unevacz was engaged to manage the production process of the Luci ... Mr. Bunevacz also agreed to maintain the confidential information of it for his own purposes. It is the Company's belief that Mr. Bunevacz

used the Company's confidential and proprietary information in creating – or working with others to create – the Sunlight Lantern.

Given your prior dealing with Mr. Bunevacz, the date of Worldwide's incorporation and the dba name you provided to the Consumer Electronics Show, the Company believes that Worldwide will be showing the Sunlight Lantern at the Consumer Electronics Show. We are hopeful that with the additional information provided herein you will agree to either withdraw from the Consumer Electronics Show or not display the Sunlight Lantern at such show.

The foregoing is made without prejudice to any rights and remedies available to the Company, which are expressly reserved.

By this letter, you are hereby also given notice not to destroy, conceal or alter any paper or electronic files and other data generated by and/or stored on your computers and storage media (e.g., hard disks, floppy disks, backup tapes), or any other electronic data, such as voice mail. Please be informed that, in the event of litigation, your failure to comply with this notice can result in severe sanctions being imposed by a court and liability in tort for spoliation of evidence or potential evidence.

Very truly yours,

Jocelyn Jacobson

**EXHIBIT B**



No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.3462 / Virus Database: 3658/6915 - Release Date: 12/12/13

**EXHIBIT B**

**Subject:** Product details inquiry from Amazon customer John Remson

**Date:** Wednesday, April 2, 2014 at 1:50:57 PM Pacific Daylight Time

**From:** John Remson - Amazon Marketplace

**To:** Proxy Works

To Whom it may concern,

I am emailing on behalf of MPOWERD Inc., creator and manufacturer of the Luci Inflatable Solar Lantern.

The ASIN number is question is: B00J9M7AVW

As you can verify from press on MPOWERD's website, MPOWERD introduced a prototype of the LUCI(r) lantern at least as early as June, 2012. Their patent application on the lamp was originally filed November 1, 2012 and MPOWERD now has U.S. utility and design applications pending (Nos. 13/926,336 and 29/457,682). I have attached the filing receipts for these applications. When these U.S. applications issue in the U.S., MPOWERD will proceed with full vigor against infringers. I've also attached the Chinese Utility Patent for your review.

The Owners of Sunlight Lantern which was formed in 2013 as opposed to MPOWERD Inc. formed in 2012 are Todd Metlen, Eli Probst and David Bunevacz (see various links for other allegations of illicit behavior against Mr. Bunevacz - http://en.wikipedia.org/wiki/David_Bunevacz, http://pagbabago.wordpress.com/category/david-bunevacz/, http://www.beverlyhills6750.com/. Interestingly enough, Mr. Metlen and Mr. Probst own Blue Ox Industrial, a trading company who was hired through Mr. Bunevacz who had a contract and an NDA and Non Compete with MPOWERD to manufacture MPOWERD products. In 2013, their website stated, "This exciting new portable solar LED lantern made by Blue Ox for Mpowerd..."(screen shot attached).

On January 7, 2014, MPOWERD commenced an arbitration against David Bunevacz and Sunlight Ltd. concerning the Sunlight Lantern. According to the allegations of that arbitration demand, pursuant to a contract between MPOWERD and David Bunevacz, Mr. Bunevacz was engaged to manage the production process of the Luci lantern, a solar powered light, for MPOWERD. Mr. Bunevacz also agreed to maintain the confidential information of MPOWERD and not use it for his own purposes. According to the arbitration demand, Mr. Bunevacz used MPOWERD's confidential and proprietary information in creating – or working with others to create - the Sunlight Lantern.

In all the circumstances, I urge you to cease and desist in buying from a company that has so purposefully traded on my client's good will. Likewise, I ask that you cease and desist the purchase and rebranding of a solar rechargeable lamp on which my client has patent rights pending.

------------- End message -------------

For Your Information: To help arbitrate disputes and preserve trust and safety, we retain all messages buyers and sellers send through Amazon.com for two years. This includes your response to the message above. Amazon.com uses filtering technology to protect buyers and sellers from possible fraud. Messages that fail this filtering will not be transmitted.

We want you to buy with confidence anytime you purchase products on Amazon.com. Learn more about Safe Online Shopping (http://www.amazon.com/gp/help/customer/display.html?nodeId=551434) and our safe buying guarantee (http://www.amazon.com/gp/help/customer/display.html?nodeId=537868).

If you believe this message is suspicious, please report it to us here: http://www.amazon.com/gp/communication-manager/report.html?
ft=InappropriateContent&msg=A10N39RRB5IX7C&d=1396470758&mp=ATVPDKIKX0DER&v=1&t=db18276efceafd72
02fc2d3977b838555eb5e328

**EXHIBIT C**

To mark this message as no response needed, click here: http://www.amazon.com/gp/communication-manager/no-response-needed.html?
msg=A10N39RRB5IX7C&d=1396470758&mp=ATVPDKIKX0DER&v=1&t=db18276efceafd7202fc2d3977b838555eb5e3
28

[commMgrTok:A10N39RRB5IX7C]

**EXHIBIT C**

US 20140118997A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2014/0118997 A1**
Snyder (43) **Pub. Date:** **May 1, 2014**

(54) **INFLATABLE SOLAR POWERED LAMP**

(71) Applicant: **MPOWERD, INC.**, New York, NY (US)

(72) Inventor: **Jason Alan Snyder**, Hoboken, NJ (US)

(21) Appl. No.: **13/926,336**

(22) Filed: **Jun. 25, 2013**

**Related U.S. Application Data**

(60) Provisional application No. 61/721,285, filed on Nov. 1, 2012.

**Publication Classification**

(51) **Int. Cl.**
*F21L 4/08* (2006.01)

(52) **U.S. Cl.**
CPC ........................................ *F21L 4/08* (2013.01)
USPC ............................................................. **362/183**

(57) **ABSTRACT**

A solar powered lamp is provided with flat ends and a translucent flexible housing, such that the housing can be inflated to form a free standing cylinder. A solar panel faces outward on one of the flat ends for recharging a low-profile rechargeable battery which, under the control of a printed circuit panel, powers an array of LEDs, which point into the lamp housing. Reflective surfaces, facing each other on opposite inside end walls of the lamp, maximize the diffusion of light from the LEDs. The lamp is a durable, portable, long light lighting solution for those who live off the electric power grid, victims of disaster, and the like.



Patent Application Publication     May 1, 2014   Sheet 1 of 2     US 2014/0118997 A1



**FIG. 1A**



**FIG. 1B**

**EXHIBIT D**



FIG. 2

1

## INFLATABLE SOLAR POWERED LAMP

[0001]  This application claims the benefit of U.S. Provisional Application No. 61/721,285, filed Nov. 1, 2012, which is incorporated by reference in its entirety.

### BACKGROUND OF THE INVENTION

[0002]  1. Field of the Invention

[0003]  The invention is in the field of solar powered lighting devices. Specifically, the disclosure pertains to an inflatable, collapsible solar powered lamp, which provides low cost lighting to people with unreliable access to electric power, including populations in the developing world and victims of disaster. The unit may also be used throughout the developed world as an energy-efficient, green portable lighting alternative.

[0004]  2. Description of the Related Art

[0005]  US 2012/0120642 to Shreshta and US 2012/0224359 to Chun are published U.S. applications directed to an inflatable solar light. The disclosed device has an inconvenient shape and lacks effective light-diffusing capabilities.

### SUMMARY OF THE INVENTION

[0006]  Thus, in one aspect, the invention is a collapsible solar powered lantern, comprising: a collapsible lantern housing; a solar panel; a rechargeable lithium-ion battery; LED lights; and a circuit board. The rechargeable battery is recharged by laying the collapsible lantern housing in direct sunlight for 4 to 5 hours for complete charging.

[0007]  In embodiments, the lantern is in the form of a lamp having a collapsible, translucent housing with flat circular end walls and a side wall. In this way, the lamp can be laid on its side so that it forms a free-standing cylinder shape when expanded. A valve is provided for inflating the collapsible housing. A planar array of light emitting diodes (LEDs) is arranged on a printed circuit board on one end wall. The printed circuit board is operatively connected to a rechargeable battery powering the LEDs; a solar panel adapted to recharge the rechargeable battery; and a switch for powering the LEDs on and off. In preferred embodiments, reflective surfaces on the end walls face each other to increase the diffused light from the device.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0008]  FIG. 1A is a perspective view of a solar powered lamp according to the invention.

[0009]  FIG. 1B is a perspective view of the solar powered lamp of FIG. 1A from the bottom side.

[0010]  FIG. 2 is an exploded view of the solar powered lamp of FIG. 1A.

### DETAILED DESCRIPTION OF THE INVENTION

[0011]  Referring to the embodiment of FIG. 1, collapsible housing 100 is made from a translucent, and preferably clear, plastic material such as polyvinylchloride (PVC), although the material used is not critical and another suitable translucent and flexible material, such as polyethylene, could be used. Housing 100 includes cylindrical side wall 14, flat circular top end wall 13, and flat circular bottom end wall 16. The flat end walls are sufficiently rigid to enable the lamp to form a free-standing cylinder when expanded. A handle 17, also preferably made out of the same flexible plastic material as the housing, permits the lamp to be attached easily to a wall

or ceiling, or be to carried as the need arises. In the most preferred embodiments, a second handle 172 is provided on the opposite end wall 16, as shown in FIG. 1B.

[0012]  As shown in the exploded view of FIG. 2, top end wall 13 preferably includes an inner top 134 and outer top 132. Bottom end wall 16 includes inner bottom 162 and outer bottom 164. The inner and outer top (132, 134) are sealed to the side wall 14 and to each other to enclose top reflector 125 in water-tight fashion. It is generally preferable that the housing be sealed to an ingress protection level known as IP 67, which means protected against the ingress of dust and contaminants, and against the effects of temporary immersion in between 15 cm and 1 m of water for 30 minutes. Top reflector 125 has a reflective surface directly facing the LEDs 28 positioned on the bottom end wall and may be made out of PVC plated with a reflective coating, cardstock with a reflective coating, or other suitable material to provide stiffness to the housing end wall 13, and also to reflect light from the LEDs 28.

[0013]  A similar arrangement is provided on the bottom end wall 16, with bottom reflector 166 formed of a reflective-coated material. The bottom reflector is provided with apertures 44 positioned over the LED lights 28. Apertures 44 may be provided with a diffusive scrim material to close off the openings.

[0014]  LED lights 28 are in turn provided on a printed circuit board 200 on an end wall of the device. A rechargeable battery 40, adapted to power the LEDs, is provided on the printed circuit board 200 opposite a solar panel 202 (shown in FIG. 1B) adapted to recharge the rechargeable battery 40. The solar panel is exposed to the sunlight through the clear outer bottom 164 through an aperture in bottom frame 160. The printed circuit board is attached to bottom frame member 166 with double sided tape 202.

[0015]  A solar panel for use with the invention may be selected from those known in the art to be adapted to power a small LED array. A suitable solar panel is a polycrystalline 5V/130 mA array with an open circuit voltage of 4.3 V, a short circuit current of about 3.5 A, and an optimum operating voltage of 2.6 V. Generally, when the solar panel is laid in direct sunlight, the rechargeable battery is completely charged in 4 to 8 hours, with sufficient charge to yield more than 6 hours of light and preferably more than 8 hours of light once fully charged. Although any number of LEDs may be used within the scope of the invention, 6 to 10 LEDs is preferable, and 8 is most preferred. The LEDs provide a 4000 mcd light source, sufficient to illuminate a 10 square foot area with usable lighting. In embodiments, multicolored LEDs may be used. Use of multicolor LEDs may be functional, such as red or yellow to indicate emergency condition, or decorative.

[0016]  The rechargeable battery 40 is preferably a lithium-ion polymer battery with a thin profile that can be readily incorporated onto a printed circuit board. In the most preferred embodiments, the rechargeable battery has a thickness of no more than about 5 mm, a capacity of 1000 mAh, and a nominal operating voltage of 3.7 V. wherein the planar array of LEDs consists of eight LEDs arranged in a circle and powered by the battery. In a preferred embodiment, each LED has a maximum operating current of 320 mA at 90 lumens (high power) and 220 mA at 70 lumens (low power).

[0017]  The printed circuit board 200 controls the powering of the LEDs by the battery 40. A user activates a power switch 204 located on the exterior of the lamp to power the LEDs. In

## EXHIBIT D

embodiments, the circuit board controls three levels of illumination: low power, high power and intermittent. The levels can be obtained by pressing the same power switch used to turn the device off and on. For example, the switch may be pressed once for low power, twice for high power, three times for intermittent, and four times to turn the device off. Sourcing a suitable such microchip for this purpose may be left to the skill of the ordinarily skilled artisan.

[0018]   The housing is collapsible and is preferably inflatable through a valve 123 through the top end wall 13. Apertures are provided in the top reflector and inner top into the interior of the housing so that the housing can be inflated, resulting in a low-cost, lightweight and durable lighting solution for those in need.

[0019]   The above description of the preferred embodiments is not to be deemed limiting of the invention, which is defined by the following claims. The foregoing description should provide the artisan of ordinary skill with sufficient information to practice variants of the embodiments described. Features and improvements described in connection with one embodiment may be combined with other embodiments without departing from the scope of the invention.

1. An inflatable solar powered lamp, comprising:

a collapsible, translucent housing having flat end walls and a side wall;

a valve for inflating the housing;

a printed circuit board on one end wall comprising a planar array of light emitting diodes (LEDs);

a rechargeable battery attached to the printed circuit board powering the LEDs;

a solar panel adapted to recharge the rechargeable battery; and

the circuit board being operatively connected to the rechargeable battery, the LEDs, the solar panel, and a switch for powering the LEDs on and off.

2. The solar powered lamp according to claim 1, wherein the flat end walls are circular and the lamp is cylindrical in an inflated state.

3. The solar powered lamp according to claim 1, further comprising planar reflective panels covering substantially the entire exposed inside surface of each end wall.

4. The solar powered lamp according to claim 1, wherein the housing is clear flexible polyvinylchloride (PVC) sealed to be water-tight.

5. The solar powered lamp according to claim 1, wherein a reflective surface provided on one of the flat ends has apertures positioned over the LEDs.

6. The solar powered lamp according to claim 1, wherein each flat end wall is circular and comprises an inner end wall, an outer end wall and a reflective panel sealed between the inner end wall and the outer end wall.

7. The solar powered lamp according to claim 1, wherein the battery is a lithium ion polymer battery pack having a thickness less than 5 mm, a capacity of 1000 mAh, and a nominal operating voltage of 3.7 V, wherein the planar array of LEDs consists of eight LEDs arranged in a circle and powered by the battery, each having a maximum operating current of 320 mA at 90 lumens.

8. The solar powered lamp according to claim 1, further comprising a handle attached to one or both flat ends.

9. A collapsible solar powered lantern, comprising:

a collapsible lantern housing;

a solar panel;

a rechargeable lithium-ion battery;

LED lights; and

a circuit board, wherein the rechargeable battery is recharged by laying the collapsible lantern housing in direct sunlight for 4 to 5 hours for complete charging, capable of powering the LEDs without charging for at least 8 hours.

10. The collapsible solar powered lantern according to claim 1, wherein the rechargeable battery is a lithium-ion battery.

11. The collapsible solar powered lantern according to claim 1, wherein the lantern lays flat on one end.

12. The collapsible solar powered lantern according to claim 1, wherein the lantern has wall or ceiling attachments.

* * * * *

**From:** David <dave@hskconsultants.com>
**Sent:** Tuesday, May 14, 2013 2:57 PM
**To:** Eli Probst
**Subject:** Fwd: patent application for Luci

Sent from my iPhone

Begin forwarded message:

> **From:** Jacques-Philippe Piverger <jacques@mpowerd.com>
> **Date:** May 14, 2013, 2:46:31 PM PDT
> **To:** david <dave@hskconsultants.com>
> **Cc:** "steve@mpowerd.com Gundersen" <steve@mpowerd.com>, Thomas Clary
> <tom@mpowerd.com>, John Salzinger <john@mpowerd.com>
> **Subject: patent application for Luci**
>
> Dave, as follow up from our previous conversation we are now progressing with MPOWERD's IP
> attorney to file our own patent applications for Luci. We plan on adding you, Todd, Eli and the founders
> as inventors on the patent. We need everyone's address and full name. We will also need everyone to
> sign all rights of inventorship to MPOWERD as part of the process. Please let me know if this is in line
> with what everyone had in mind and Tom will get you the requisite docs as he is making sure all are
> ducks are in order with the lawyer.
>
> Cheers,
>
> **Jacques-Philippe Piverger**
> *Chief Executive Officer & Co-founder*
>
> MPOWERD™
> 231 West 29th Street, Suite 1105
> New York City 10001
> mobile 917.596.6937

**EXHIBIT E**

**From:** Steven Gundersen <stevenggundersen@gmail.com>
**Subject: Picture of a solar puff**
**Date:** March 30, 2012 1:06:31 PM MST
**To:** david <dave@hskconsultants.com>



**EXHIBIT F**

**From:** david <dave@hskconsultants.com>
**Subject: CAD lantern #1**
**Date:** April 15, 2012 7:10:14 PM MST
**To:** steven gundersen <stevenggundersen@gmail.com>





**EXHIBIT F**

**From:** steven g gundersen <stevenggundersen@gmail.com>
**Subject: Re: prototype for CAD #1**
**Date:** April 16, 2012 7:30:14 AM MST
**To:** david <dave@hskconsultants.com>

This is great David!! thanks, SG

---

**From:** "david" <dave@hskconsultants.com>
**To:** "steven gundersen" <stevenggundersen@gmail.com>
**Cc:** "steven gundersen" <stevenggundersen@gmail.com>
**Sent:** Sunday, April 15, 2012 10:16:02 PM
**Subject:** prototype for CAD #1

Steven,

The first prototype as you can see has a hole in it but it is only for ventilation to protect against moisture and heat especially if this is going to be used in a humid climate.As you can see you do not have to blow it up instead it is easily popped up using just your fingers and then the mesh thin material will be used to pull to collapse the lantern. The prototype can be finished in 10 days once the GO signal is given. The material will also be waterproof and all of the other criteria will be met as well but the proof is in the prototype.Let me know your thoughts.I will have the second prototype by wed latest thursday.
David

**EXHIBIT F**

**Subject:** Fwd: solar lantern questions

**Date:** Wednesday, July 3, 2013 at 4:44:31 PM Pacific Daylight Time

**From:** david

**To:** Eli Probst

Begin forwarded message:

> **From:** Steven Gundersen <stevenggundersen@gmail.com>
> **Subject: Fwd: solar lantern questions**
> **Date:** April 23, 2012 8:40:00 AM MST
> **To:** david <dave@hskconsultants.com>
>
> Here's the other. Scroll down.
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** John Salzinger <john@roosterco.com>
> > **Date:** April 23, 2012 11:05:37 AM EDT
> > **To:** Steven Gundersen <stevenggundersen@gmail.com>
> > **Cc:** Jacques-Philippe Piverger <jacques@roosterco.com>, Jason Alan Snyder <jas@roosterco.com>, Henry Lihn <henry@roosterco.com>
> > **Subject: Re: solar lantern questions**
> >
> > Steve
> >
> > 2.  Now the material supplying factory told us one thing: Look at the sample you gave to us, the textile part is weaved in square lines and Oblique lines, the factory told us if just made in square line, production time can be controlled better, and it is also ok to weave both oblique lines, but it may not be weaved exactly same as the sample you gave to us, we mean the weaving way of the oblique lines, so do you have any requirements on the polyester's weaving way? Must be exactly same as the sample? Or we can control it ourselves? This is the most important part I need your feedback on.Does the material have to look exactly like the sample or can it be very similar as long as it has the same function and is as durable as the original?
> >
> > DOES NOT NEED TO BE THE SAME IT NEEDS TO BE STRONG(DURABLE) WATERPROOF AND REFLECT LIGHT
> >
> > > 1.) Which country for these lanterns shipped to? Means what is the destination of these lanterns? Cause different countries have different environmental degree requirements of the materials, America has high standard.
> > > AS FOR COUNTRY - THE LIGHT NEEDS TO ADHERE TO FIRST WORLD STANDARDS - WE DO NOT WANT DANGEROUS PLASTICS ETC WITH POTENTIAL HARMFUL SIDE EFFECTS USED AS THIS WOULD BE A PR NIGHTMARE.

**EXHIBIT F**

John Salzinger
*Relationship Architect*

**The Clever Rooster Company**
349 5th Avenue New York City 10016
mobile 917.402.7102
Please consider the environment before printing this email

---

**From:** "Steven Gundersen" <stevenggundersen@gmail.com>
**To:** "Jacques-Philippe Piverger" <jacques@roosterco.com>, "Jason Alan Snyder" <jas@roosterco.com>, "John Salzinger" <sauce@roosterco.com>, "Henry Lihn" <henry@roosterco.com>
**Sent:** Monday, April 23, 2012 10:53:31 AM
**Subject:** Fwd: solar lantern questions

Hey guys just got this note.  Please give me your thoughts.  Thanks

Sent from my iPhone

Begin forwarded message:

> **From:** david <dave@hskconsultants.com>
> **Date:** April 23, 2012 10:33:40 AM EDT
> **To:** steven gundersen <stevenggundersen@gmail.com>
> **Subject: solar lantern questions**

Steve,

The most difficult part of producing the lantern is the material in which they used because it is a patented material and process which doesnt mean that we can not do it or replicate it. The following is the manufacturers questions which I need the guidance of you and your guys:

Updated news for lantern material, and also need to know some more info which is important to the material:

1.  There is no such material 100% like your sample all around in China because after research it is a custom patent material which is privately made, after so many days searching,  we have two one factories that can produce very similar material, the textile part is made by Polyester, this part is same material, the most special part is the water-proof coating, but we found the pefect factory that can produce the most similar material. It is a good news.

2.  Now the material supplying factory told us one thing: Look at the sample you gave to us, the textile part is weaved in square lines and Oblique lines, the factory told us if just made in square line, production time can be controlled better, and it is also ok to weave both oblique lines, but it may not be weaved exactly

**EXHIBIT F**

same as the sample you gave to us, we mean the weaving way of the oblique lines, so do you have any requirements on the polyester's weaving way? Must be exactly same as the sample? Or we can control it ourselves?This is the most important part I need your feedback on.Does the material have to look exactly like the sample or can it be very similar as long as it has the same function and is as durable as the original?

3. In order to calculate the production time for the order, we need to know below two questions:
   1.) Which country for these lanterns shipped to? Means what is the destination of these lanterns? Cause different countries have different environmental degree requirements of the materials, America has high standard.
   2.) How many lanterns need to be made at the moment, cause we need to see the factory production ability which is at this moment 200-250,000 pieces per month. Although we found the factory that can produce this material, at the same time, we also need to inspect their production ability because at the moment they are saying they can produce our needs but we must make a high volume production of maybe 10,000 units to see for ourselves, if not perfect, we need to use our second factory but is far away and want to keep quality control close together.
   3.) It takes quite long time for the water-proof coating to set and dry.

**EXHIBIT F**

**Subject:** Fwd: solar lantern questions

**Date:** Wednesday, July 3, 2013 at 4:44:01 PM Pacific Daylight Time

**From:** david

**To:** Eli Probst

Begin forwarded message:

> **From:** Steven Gundersen <stevenggundersen@gmail.com>
> **Subject: Fwd: solar lantern questions**
> **Date:** April 23, 2012 8:39:21 AM MST
> **To:** david <dave@hskconsultants.com>
>
> I'll send you two email responses. Both are right.
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** Henry Lihn <henry@roosterco.com>
> > **Date:** April 23, 2012 11:04:11 AM EDT
> > **To:** Steven Gundersen <stevenggundersen@gmail.com>
> > **Cc:** Jacques-Philippe Piverger <jacques@roosterco.com>, Jason Alan Snyder <jas@roosterco.com>, John Salzinger <sauce@roosterco.com>
> > **Subject: Re: solar lantern questions**
> >
> > We should a cheap, durable, non patented material.
> >
> > Sent from my iPhone
> >
> > On Apr 23, 2012, at 10:54 AM, Steven Gundersen <stevenggundersen@gmail.com> wrote:
> >
> > > Hey guys just got this note. Please give me your thoughts. Thanks
> > >
> > > Sent from my iPhone
> > >
> > > Begin forwarded message:
> > >
> > > > **From:** david <dave@hskconsultants.com>
> > > > **Date:** April 23, 2012 10:33:40 AM EDT
> > > > **To:** steven gundersen <stevenggundersen@gmail.com>
> > > > **Subject: solar lantern questions**
> > > >
> > > > Steve,
> > > >
> > > > The most difficult part of producing the lantern is the

**EXHIBIT F**

material in which they used because it is a patented material and process which doesnt mean that we can not do it or replicate it. The following is the manufacturers questions which I need the guidance of you and your guys:

Updated news for lantern material, and also need to know some more info which is important to the material:

1.   There is no such material 100% like your sample all around in China because after research it is a custom patent material which is privately made, after so many days searching,  we have two one factories that can produce very similar material, the textile part is made by Polyester, this part is same material, the most special part is the water-proof coating, but we found the pefect factory that can produce the most similar material. It is a good news.

2.   Now the material supplying factory told us one thing: Look at the sample you gave to us, the textile part is weaved in square lines and Oblique lines, the factory told us if just made in square line, production time can be controlled better, and it is also ok to weave both oblique lines, but it may not be weaved exactly same as the sample you gave to us, we mean the weaving way of the oblique lines, so do you have any requirements on the polyester's weaving way? Must be exactly same as the sample? Or we can control it ourselves?This is the most important part I need your feedback on.Does the material have to look exactly like the sample or can it be very similar as long as it has the same function and is as durable as the original?

3.   In order to calculate the production time for the order, we need to know below two questions:
   1.)   Which country for these lanterns shipped to? Means what is the destination of these lanterns? Cause different countries have different environmental degree requirements of the materials, America has high standard.
   2.)   How many lanterns need to be made at the moment, cause we need to see the factory production ability which is at this moment 200-250,000 pieces per month. Although we found the factory that can produce this material, at the same time, we also need to inspect their production ability because at the moment they are saying they can produce our needs but we must make a high volume production of maybe 10,000 units to see for ourselves, if not perfect, we need to use our second factory but is far away and want to keep quality control close together.
   3.)   It takes quite long time for the water-proof coating to set and dry.

**EXHIBIT F**

**Subject:** Fwd: solar lantern questions

**Date:** Wednesday, July 3, 2013 at 4:44:31 PM Pacific Daylight Time

**From:** david

**To:** Eli Probst

Begin forwarded message:

> **From:** Steven Gundersen <stevenggundersen@gmail.com>
> **Subject: Fwd: solar lantern questions**
> **Date:** April 23, 2012 8:40:00 AM MST
> **To:** david <dave@hskconsultants.com>
>
> Here's the other. Scroll down.
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** John Salzinger <john@roosterco.com>
> > **Date:** April 23, 2012 11:05:37 AM EDT
> > **To:** Steven Gundersen <stevenggundersen@gmail.com>
> > **Cc:** Jacques-Philippe Piverger <jacques@roosterco.com>, Jason Alan Snyder <jas@roosterco.com>, Henry Lihn <henry@roosterco.com>
> > **Subject: Re: solar lantern questions**
> >
> > Steve
> >
> > 2. Now the material supplying factory told us one thing: Look at the sample you gave to us, the textile part is weaved in square lines and Oblique lines, the factory told us if just made in square line, production time can be controlled better, and it is also ok to weave both oblique lines, but it may not be weaved exactly same as the sample you gave to us, we mean the weaving way of the oblique lines, so do you have any requirements on the polyester's weaving way? Must be exactly same as the sample? Or we can control it ourselves? This is the most important part I need your feedback on.Does the material have to look exactly like the sample or can it be very similar as long as it has the same function and is as durable as the original?
> >
> > DOES NOT NEED TO BE THE SAME IT NEEDS TO BE STRONG(DURABLE) WATERPROOF AND REFLECT LIGHT
> >
> > > 1.) Which country for these lanterns shipped to? Means what is the destination of these lanterns? Cause different countries have different environmental degree requirements of the materials, America has high standard.
> > > AS FOR COUNTRY - THE LIGHT NEEDS TO ADHERE TO FIRST WORLD STANDARDS - WE DO NOT WANT DANGEROUS PLASTICS ETC WITH POTENTIAL HARMFUL SIDE EFFECTS USED AS THIS WOULD BE A PR NIGHTMARE.

**EXHIBIT F**

John Salzinger
*Relationship Architect*

**The Clever Rooster Company**
349 5th Avenue New York City 10016
mobile 917.402.7102
Please consider the environment before printing this email

---

**From:** "Steven Gundersen" <stevenggundersen@gmail.com>
**To:** "Jacques-Philippe Piverger" <jacques@roosterco.com>, "Jason Alan Snyder" <jas@roosterco.com>, "John Salzinger" <sauce@roosterco.com>, "Henry Lihn" <henry@roosterco.com>
**Sent:** Monday, April 23, 2012 10:53:31 AM
**Subject:** Fwd: solar lantern questions

Hey guys just got this note.  Please give me your thoughts.  Thanks

Sent from my iPhone

Begin forwarded message:

> **From:** david <dave@hskconsultants.com>
> **Date:** April 23, 2012 10:33:40 AM EDT
> **To:** steven gundersen <stevenggundersen@gmail.com>
> **Subject: solar lantern questions**
>
> Steve,
>
> The most difficult part of producing the lantern is the material in which they used because it is a patented material and process which doesnt mean that we can not do it or replicate it. The following is the manufacturers questions which I need the guidance of you and your guys:
>
> Updated news for lantern material, and also need to know some more info which is important to the material:
>
> 1.  There is no such material 100% like your sample all around in China because after research it is a custom patent material which is privately made, after so many days searching,  we have two one factories that can produce very similar material, the textile part is made by Polyester, this part is same material, the most special part is the water-proof coating, but we found the pefect factory that can produce the most similar material. It is a good news.
>
> 2.  Now the material supplying factory told us one thing: Look at the sample you gave to us, the textile part is weaved in square lines and Oblique lines, the factory told us if just made in square line, production time can be controlled better, and it is also ok to weave both oblique lines, but it may not be weaved exactly

**EXHIBIT F**

same as the sample you gave to us, we mean the weaving way of the oblique lines, so do you have any requirements on the polyester's weaving way? Must be exactly same as the sample? Or we can control it ourselves?This is the most important part I need your feedback on.Does the material have to look exactly like the sample or can it be very similar as long as it has the same function and is as durable as the original?

3. In order to calculate the production time for the order, we need to know below two questions:
   1.) Which country for these lanterns shipped to? Means what is the destination of these lanterns? Cause different countries have different environmental degree requirements of the materials, America has high standard.
   2.) How many lanterns need to be made at the moment, cause we need to see the factory production ability which is at this moment 200-250,000 pieces per month. Although we found the factory that can produce this material, at the same time, we also need to inspect their production ability because at the moment they are saying they can produce our needs but we must make a high volume production of maybe 10,000 units to see for ourselves, if not perfect, we need to use our second factory but is far away and want to keep quality control close together.
   3.) It takes quite long time for the water-proof coating to set and dry.

**EXHIBIT F**

**Subject:** Fwd: this is a glorious lantern design

**Date:** Wednesday, July 3, 2013 at 5:06:33 PM Pacific Daylight Time

**From:** david

**To:** Eli Probst

Begin forwarded message:

> **From:** david <dave@hskconsultants.com>
> **Subject: Re: this is a glorious lantern design**
> **Date:** April 27, 2012 1:20:21 PM MST
> **To:** Steve Gundersen <steve@roosterco.com>
>
> THIS IS EASY TO DO BUT WILL BE MORE EXPENSIVE IN MY OPINION AND IS MUCH SMALLER WHICH IS KIND OF COOL TOO.
> On Apr 27, 2012, at 1:13 PM, Steve Gundersen wrote:
>
>> Hey just FYI.  Jason found this on line.  Maybe helps you're guys in design/ R & D??
>>
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** Jason Alan Snyder | The Clever Rooster Company <jas@roosterco.com>
>>> **Date:** April 27, 2012 3:16:04 PM EDT
>>> **To:** Jacques-Philippe Piverger <jacques@roosterco.com>, "Jill " <jjjivdb@gmail.com>, John Salzinger <sauce@roosterco.com>, Henry Lihn <henry@roosterco.com>, Steve Gundersen <steve@roosterco.com>
>>> **Subject: this is a glorious lantern design**
>>>
>>> http://jesperj.se/index.php?/projects/project-soul-cell/
>>>
>>> Jason Alan Snyder
>>> *Founder*
>>>
>>> **The Clever Rooster Company**
>>> 349 5th Avenue New York City 10016
>>> mobile 917.267.8391

**EXHIBIT F**

**Subject:** Fwd: solar lantern questions

**Date:** Wednesday, July 3, 2013 at 5:08:07 PM Pacific Daylight Time

**From:** david

**To:** Eli Probst

Begin forwarded message:

> **From:** david <dave@hskconsultants.com>
> **Subject: Re: solar lantern questions**
> **Date:** April 28, 2012 12:28:56 AM MST
> **To:** Steve Gundersen <steve@roosterco.com>
>
> 1500 was just for the CAD design which is very steep but we wanted a super rush job.Now they want a completely new product?I need some pictures or guidance. The Chinese are only good at copying other peoples designs.I might have to hire a good design team if this is the case.
> On Apr 27, 2012, at 3:43 PM, Steve Gundersen wrote:
>
>> Let's talk.
>>
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** John Salzinger <john@roosterco.com>
>>> **Date:** April 27, 2012 5:38:17 PM EDT
>>> **To:** Steve Gundersen <steve@roosterco.com>
>>> **Cc:** Jason Alan Alan Snyder <jas@roosterco.com>, Hank Henry Lihn <henry@roosterco.com>, Jacques Phillipe <jacques@roosterco.com>
>>> **Subject: Fwd: solar lantern questions**
>>>
>>> Steve
>>>
>>> Thought it was $1,500 per prototype. Initial comments from team are new shape needed, new material needed, should be heat sealed not taped.
>>>
>>> Thoughts...
>>>
>>> Sauce
>>>
>>> Begin forwarded message:
>>>
>>>> **From:** david <dave@hskconsultants.com>
>>>> **Date:** April 27, 2012 4:35:55 PM EDT
>>>> **To:** John Salzinger <john@roosterco.com>
>>>> **Subject: Re: solar lantern questions**

**EXHIBIT F**

I saw the other lamp that Jason found online but looks more expensive but easier to build because of the material. I need a confirmation if you want another prototype done but just keep in mind it 8500 for every new proto.
David

Sent from my iPhone

On Apr 27, 2012, at 11:05 AM, John Salzinger <john@roosterco.com> wrote:

> David
>
> Please resend the jpegs on a reply-all. The entire team did not see them.
>
> Thank you very much.
>
> John Salzinger
>
>
> On Apr 27, 2012, at 1:57 PM, david <dave@hskconsultants.com> wrote:
>
> > Can anyone give me feedback on the pictures because the factory is waiting to hear if its too big, too small,etc.
> > On Apr 23, 2012, at 10:32 AM, Steven Gundersen wrote:
> >
> >
> > > Sent from my iPhone
> > >
> > > Begin forwarded message:
> > >
> > > > **From:**
> > > > Jacques-Philippe Piverger <jac

**EXHIBIT F**

**Subject:** Fwd: lantern project is getting bigger and bigger

**Date:** Wednesday, July 3, 2013 at 5:08:46 PM Pacific Daylight Time

**From:** david

**To:** Eli Probst

Begin forwarded message:

> **From:** david <dave@hskconsultants.com>
> **Subject: lantern project is getting bigger and bigger**
> **Date:** May 1, 2012 10:12:01 PM MST
> **To:** Steven Gundersen <stevenggundersen@gmail.com>
> **Cc:** Steve Gundersen <steve@roosterco.com>
>
> Steven,
>
> They have just come out with a better solar panel which they believe to be much more superior. Also you can see they have made another form of the material but it is too hard and not easily collapsible.We are getting a second set of CAD designs of the new model and style of lantern which will be in your email on Friday Morning. The factory that makes the material almost exactly like your original lantern did not want to do a run for just a prototype lantern because they would have to run several large sheets of the material just to give us a tiny piece for one prototype so I had to bribe them to get it done. Also they will choose a different material for the second lantern design which will suit the model. Both new prototypes will be landed in New York on May 15. I don't think anyone in the world can make you 2 new prototypes of anything from scratch in 10 days.They will DHL both prototypes on May 11. Please take a look at these pictures of the new solar board and lantern.Please forward this to your team.



**EXHIBIT F**



**EXHIBIT F**

**Subject:** Fwd: Little Sun solar light/ please check it out

**Date:** Wednesday, July 3, 2013 at 5:09:29 PM Pacific Daylight Time

**From:** david

**To:** Eli Probst

Begin forwarded message:

> **From:** david <dave@hskconsultants.com>
> **Subject: Re: Little Sun solar light/ please check it out**
> **Date:** May 3, 2012 8:02:10 PM MST
> **To:** Steve Gundersen <steve@roosterco.com>
>
> Guys,
> I have been notified that the sample lantern we have sent to China is already ripping in several places
> and wouldn't last a month. In my humble opinion I LOVE the idea of making a pocket disc or "Pocket
> lantern" that is made from light plastic and has a very nice shape that will illuminate the LED lights
> nicely and brightly.Going off of the "little Sun" website we can take it to the next level and make it
> sleeker and thinner and the shape of like a throwing star that ninja's use as I attached.This would just
> be the design in which the led lights will light through but the disc itself will be smoother and more
> round.This would be much easier for the Chines to conceptualize because they can just make a mold
> for this and insert the solar board on top. This would also be easier to make waterproof,I think.This is
> just my opinion.We can also put a velcro application and this can be stuck onto anything or hanged
> from anywhere.
> DAvid

**EXHIBIT F**

**Subject:** Fwd: new solar lantern
**Date:** Wednesday, July 3, 2013 at 4:57:09 PM Pacific Daylight Time
**From:** david
**To:** Eli Probst

Begin forwarded message:

> **From:** Steven Gundersen <stevenggundersen@gmail.com>
> **Subject: Fwd: new solar lantern**
> **Date:** May 4, 2012 9:24:48 AM MST
> **To:** david <dave@hskconsultants.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Jacques-Philippe Piverger <jacques@roosterco.com>
> **Date:** May 4, 2012 12:12:18 PM EDT
> **To:** steven g gundersen <stevenggundersen@gmail.com>
> **Cc:** "john@roosterco.com" <john@roosterco.com>, Jason Alan Snyder
> <jas@roosterco.com>
> **Subject: Re: new solar lantern**

I disagree about the idea that any soft material will tear in a month. Challenge is simply finding the right material. I have been using the original puff model for months and it has not torn. I'm sure there are materials that are even better than the puff. We've gotten major initial interest mostly on the back of light weight, flat packed, easy to transport, low cost, and brighter than alternatives. I think the easiest and best thing for us to do is deviate as little as we must. In this instance on real deviation necessary is a different shape. An unnecessary, but good alteration, has already been achieved with increased brightness. Now we should get out of our own way and "keep it simple stupid".

Should we research viable materials to send over?

Sent from my iPhone

On May 4, 2012, at 11:13 AM, steven g gundersen <stevenggundersen@gmail.com> wrote:

**From:** "david" <dave@hskconsultants.com>
**To:** "Steven Gundersen" <stevenggundersen@gmail.com>
**Sent:** Friday, May 4, 2012 2:42:32 AM

**EXHIBIT F**

**Subject:** new solar lantern

Steve,
we had a 2 hour conference call with the designer, the solar engineer, and the plastics manufacturer about this project to get some real direct feedback in which direction to go, both quickly and smartly.It is a unanimous decision that any soft material you make that is made with plastic or paper will eventutally tear and rip within a month of everyday use as did your original sample that you sent to China from the USA. Unless it is canvass there is no chance of it handling the stress of time and the collapsing and opening in a humid climate as that of thirf world countries.
Now, with the design of a light plastic cased unit which capsulates the lights and the solar board in a solid piece there is a much less chance for it to break or have any defects. The unit will also be light and small enough to carry or put in a small bag or purse. We will put a hanger on the top and a sort of kick-stand at the rear as a picture frame would have so it can sit on a desk or flat surface. There can also be a velcro application to be able to stick it on a wall or verticle surface.
The designers are changing the look of the disc to look more like an image of the sun and we can even have the plastic made in a matte color finish of the colors of HAITI or whatever country you would like. This model will surely be much more durable and practicle. Please let me know your thoughts on or before 10am est, otherwise I will be available after 1pm est.

DAvid


<sun_back_small(05-04-14-13-36).jpg>

**EXHIBIT F**

**Subject:** Fwd: solar lantern project
**Date:** Wednesday, July 3, 2013 at 4:58:01 PM Pacific Daylight Time
**From:** david
**To:** Eli Probst

Begin forwarded message:

> **From:** david <dave@hskconsultants.com>
> **Subject: solar lantern project**
> **Date:** May 4, 2012 3:20:55 PM MST
> **To:** david <dave@hskconsultants.com>
>
> This lantern should be a cylinder shape which is roughly 5-6 inches tall and 3.5-4 inches wide. It should be collapsible and made of a waterproof material and should be able to last for at least 6-8 hours.I have attached pictures
>
> 1. different shape like a cylinder and not box shape like the model.
> 2. more elegeant finishing, i.e., no taped edges.
> 3. ability for the product to flash for emergencies
> 4. no blowing to avoid airborn diseases and maintain sanitary standards
> 5. made of recycled material
> 6. push "on/off" button rather than a sliding switch
> 7. completely water proof
> 8. brighter
> 9. last longer
> 10. sleek and cool packaging
> 11. internal reflector that is made of a material that has greater reflecting capabilities
> 12. a sleek handle/hook
> 13. stays on irrespective of how it is held.
>
> SPECIFICATIONS:
> - This item is meant to be used as a task light (cooking, sewing or reading light)
> - Solar powered
> - A single charge should last for 6-8 hrs
> - One button - easy on and off
> - Equivalent to a 60 watt bulb or greater
> - The ability to dim and brighten the light (i.e. one press of a button for bright, another for dull and a third to turn the unit off)
> - Light should be dispersed or filtered (the opposite of a focused beam or spotlight)
> - Construction of the unit to eliminate shadows as much as possible
> - LED lights
> - A red mode and a blinking mode to indicate

**EXHIBIT F**

distress  (This could also be accomplished by a red sleeve that ships with the unit)
- Collapsible design for flat packaging and low-cost shipping
- Durable, finished, waterproof, light weight
- Partially or entirely made of recycled and recyclable material
- Long lasting on a charge
- Can be carried, mounted or hung
- Stays on irrespective of how it is held (ie. can be carried and used as a lantern/torch without going of



**EXHIBIT F**

**Subject:** Fwd: First set of drawings
**Date:** Wednesday, July 3, 2013 at 4:54:36 PM Pacific Daylight Time
**From:** david
**To:** Eli Probst

Begin forwarded message:

**From: david <dave@hskconsultants.com>**
**Subject: Fwd: First set of drawings**
**Date: May 8, 2012 6:58:28 PM MST**
**To: Catherine Zhang <sales01@kingcreat.com>**

CATHERINE,ASK YOUR ENGINEER WHAT HE THINKS ABOUT THIS DESIGN?IS IT EASIER OR MORE DIFFICULT??

Dave,

I have the first set of drawings that I have put together, I wont have the parts drawing till around 7am eastern time.  But hopefully these is what you are looking for, I really like the new design I think it is very elegant and should really work well.  The one thing we still need to think about in this design is going to be the switch, if it could be on the bottom or if we need to remove it from the board and mount it to one of the panels.  The other will be if the light will stand tall on its own or will it collapse back in on itself we might need to have a prop stick or something to keep it standing tall.  But please let me know what you think and we can make changes if you need.

**EXHIBIT F**



SCALE 1:1

Ø114

92

Ø163

SCALE 2:3

**EXHIBIT F**



**EXHIBIT F**

**Subject:** Fwd: CAD Designs and 3d
**Date:** Wednesday, July 3, 2013 at 5:10:04 PM Pacific Daylight Time
**From:** david
**To:** Eli Probst

Begin forwarded message:

**From:** david <dave@hskconsultants.com>
**Subject: Fwd: CAD Designs and 3d**
**Date:** May 9, 2012 10:03:10 AM MST
**To:** Steven Gundersen <stevenggundersen@gmail.com>
**Cc:** Steve Gundersen <steve@roosterco.com>

This is the design they have been working on and might work better but we will see.
As you can see with all of these CAD designs we are not wasting anytime in getting
this done.I have all forces working to get a great product to the table.



**EXHIBIT F**







**EXHIBIT F**

**Subject:** Fwd: One other rendering with see through design
**Date:**   Wednesday, July 3, 2013 at 5:09:48 PM Pacific Daylight Time
**From:**   david
**To:**     Eli Probst

Begin forwarded message:

**From:** david <dave@hskconsultants.com>
**Subject: Fwd: One other rendering with see through design**
**Date:** May 9, 2012 7:27:02 AM MST
**To:** Steve Gundersen <steve@roosterco.com>
**Cc:** Steven Gundersen <stevenggundersen@gmail.com>



**EXHIBIT F**



**EXHIBIT F**

**REDACTED**

**From:** Jacques-Philippe Piverger <jacques@mpowerd.com>
**Date:** June 18, 2013, 7:54:51 PM PDT
**To:** David <dave@hskconsultants.com>
**Cc:** Steve Gundersen <sgg@micropowerdesign.com>
**Subject: Factory/manufacturing deal points to discuss**

Dave, good speaking this evening.  Below are the key points i've determined to be important to finalizing an agreement between our firms for the purpose of manufacturing the Luci.  Please review and provide feedback regarding which ones are in line with your expectations and which ones need further clarification or amending.

Best,
Jacques-Philippe

Some of the terms to discuss include:

**REDACTED**

**EXHIBIT G**

**REDACTED**



8) MPOWERD needs solid non-compete, non-disclosure, assignment of invention from Dave/factory/Blue Ox

11) MPOWERD is in charge of mktg and sales of Luci products.  Use of logo in mktg materials needs to be pre-approved by MPOWERD, for example, for placement on packaging of MPOWERD products.  Blue Ox/Dave can say they manufacture our Luci product, not design, etc.  MPOWERD bldg in-house development team and wants to be known for innovation. That is part of the value proposition of the firm.

13) Once we are clear on all main terms of engagement we will have our respective attorneys ensure an appropriate contract is in place to cover our respective interests.

**EXHIBIT G**

## Production Contractor Agreement

This Agreement is entered into as of the _10_ day of _August_, 20_21_, between MpowerD Inc., a New York Benefit Corporation ("the Company") at 1 Little West 12th Street, New York, NY 10014 and DAVID BUNEVACZ ("the Contractor") at 23810 Spinnaker Court, Valencia, CA 91355.

### RECITALS

Company is engaged in the business of creating solar lights.

Whereas, the Contractor has provided significant service to Company in the planning, research, development and manufacturing process for the Luci solar powered light.

Whereas, the Contractor desires to continue to facilitate the production process of the Luci solar powered light.

**NOW, THEREFORE,** in consideration of the above recitals and the mutual promises and conditions contained in this Agreement, the Parties agree as follows:

**1. Independent Contractor.**

1.1     Subject to the terms and conditions of this Agreement, the Company hereby engages the Contractor as an independent contractor to perform the services set forth herein, and the Contractor hereby accepts such engagement. This Agreement does not constitute a hiring by either party. This Agreement shall not render the Contractor an employee, partner, agent of, or joint venturer with the Company for any purpose. The Contractor is and will remain an independent contractor in his or her relationship to the Company. The Company shall not be responsible for withholding taxes with respect to the Contractor's compensation hereunder. The Contractor shall have no claim against the Company hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind.

1.2     The Contractor shall have an independent contractor status and not be an employee for any purposes, including, but not limited to, the application of the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, the provisions of the Internal Revenue Code, the State Revenue and Taxation Code relating to income tax withholding at the source of income, the Workers' Compensation Insurance Code 401(k) and other benefit payments and third party liability claims. The Contractor shall retain sole and absolute discretion in the manner and means of carrying out their activities and responsibilities under this Agreement. This Agreement shall not be considered or construed to be a partnership or joint venture, and the Company shall not be liable for any obligations incurred by the Contractor unless specifically authorized in writing. The Contractor shall not act as an agent of the Company, ostensibly or otherwise, nor bind the Company in any manner, unless specifically authorized to do so in writing.

1

8/10/12

**EXHIBIT H**

**1.3**     All expenses related to the contractor's services under this Agreement shall be borne by the Contractor, not the Company.

## 2. Scope of Services.

**2.1**     The Contractor shall manage quality control for the production and manufacturing of the Luci solar light. Company and Contractor shall set forth mutual agreed upon standards for quality ("Quality Standards") (e. g. description, specifications, data sheets, drawings, product samples). The Contractor shall ensure that the manufacturer is in compliance with the Quality Standards, and take the necessary action to communicate any non-compliance with Quality Standards, as well as take action to ensure swift and accurate compliance with Quality Standards at any stage of the production and manufacturing process.

**2.2**     The Contractor shall manage inventory security by ensuring that all Luci solar lights make it from the manufacturer to Company, and/or its distributors and affiliates in proper working condition without damage of any kind.

**2.3**     The Contractor shall manage the production process of Luci solar lights. Contractor shall lead the production process and act on behalf of the company to communicate with the manufacturer at every stage of the production and manufacturing process. Contractor, shall however gain permission of Company for any material decisions in the production and manufacturing process.

**2.4**     The Contractor shall provide Company with regular updates and general advice as to the production and manufacturing process.

## 3. Term.

This engagement shall commence upon execution of this Agreement and shall continue in full force and effect until two years after the date of this Agreement. The Agreement may only be extended thereafter by mutual agreement, unless terminated earlier by operation of and in accordance with this Agreement.

## 4. Compensation.

**4.1**     As full compensation for the services rendered pursuant to this Agreement, the Company shall pay the Contractor:

> a sum equal to $0.40 per Luci light for the first 200,000 units sold during the term of this agreement;

> thereafter, a sum equal to $0.25 per Luci light sold by the Company during the term of this agreement.

2

8/10/12

JP

**EXHIBIT H**

4.2    Company shall make the above payments to Contractor on a quarterly basis by the 10th day of January, April, July and September.

4.3    Company shall have no obligation to pay Contractor for sales occurring after the term of this Agreement.

## 5. Written Reports.

5.1    Contractor shall compile a quarterly written report for the Company consisting of number of units produced, manufacturer, cost of units produced, cost of components and raw materials as well as any other information Company shall reasonably request.

## 6. CONFIDENTIAL INFORMATION

6.1    Each Party agrees and undertakes that during the term of this Agreement and thereafter it shall keep confidential and shall not use for its own purposes all information of a confidential nature (including, without limitation, information relating to a Party's business, know-how, processes, product information and trade secrets) which may become known to that Party from the other Party ("Confidential Information"),

6.2    Either Party's Confidential Information shall be maintained in strictest confidence by the other Party and shall be treated as the other Party would treat its own Confidential Information. It may only be used for the sole purpose of assisting that other Party in adequately discharging its obligations hereunder. Such Confidential Information shall not be disclosed to any third party, without prior written consent from the other Party or unless required by local law. This obligation shall survive the termination of this Agreement for seven (7) years from the end of the contract.

## 7. Covenant to Not Compete.

7.1    The Contractor hereby agrees that during the course of the Agreement and for a period of twenty four months immediately following the expiration or termination of the Agreement for any reason, whether with or without good cause or for any or no cause, at the option either of the Company or the Independent Contractor, with or without notice, the Independent Contractor will not compete with the Company and its successors and assigns, without the prior written consent of the Company.

The term "not compete" as used herein shall mean that the Independent Contractor shall not, without the prior written consent of the Company, (i) serve as a partner, employee, Company, officer, director, manager, agent, associate, investor, or otherwise for, (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate with, any business in competition with or otherwise similar to the Company's business.

This shall cover the Independent Contractor's activities in every part of the Territory in which the Independent Contractor may conduct business during the term of the

3

8/10/02

**EXHIBIT H**

Agreement as set forth above. "Territory" shall mean (i) all counties in the State of New York, (ii) all other states of the United States of America and (iii) all other countries of the world; provided that, with respect to clauses (ii) and (iii) in this paragraph, the Company derives at least five percent (5%) of its gross revenues from such geographic area prior to the date of the expiration or termination of the Agreement. The Independent Contractor further acknowledges the time, geographic, and scope limitations of his or her obligations are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that he or she will not be precluded from gainful employment if he or she is obligated not to compete with the Company during the period and within the Territory.

## 8. Right to Injunction.

8.1     The parties hereto acknowledge that the services to be rendered by the Contractor under this Agreement and the rights and privileges granted to the Company under the Agreement are of a special, unique, unusual, and extraordinary character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in any action at law, and the breach by the Contractor of any of the provisions of this Agreement will cause the Company irreparable injury and damage. The Contractor expressly agrees that the Company shall be entitled to injunctive and other equitable relief in the event of, or to prevent, a breach of any provision of this Agreement by the Contractor. Resort to such equitable relief, however, shall not be construed to be a waiver of any other rights or remedies that the Company may have for damages or otherwise. The various rights and remedies of the Company under this Agreement or otherwise shall be construed to be cumulative, and no one of the them shall be exclusive of any other or of any right or remedy allowed by law.

## 9. Termination.

9.1     The Company may terminate this Agreement at any time by 10 working days' written notice to the Contractor. In addition, if the Contractor is convicted of any crime or offense, fails or refuses to comply with the legal or ethical standards, written policies or reasonable directive of the Company, is guilty of serious misconduct in connection with performance hereunder, or materially breaches provisions of this Agreement, the Company at any time may terminate the engagement of the Contractor immediately and without prior written notice to the Contractor.

## 10. Indemnification.

10.1     Contractor shall indemnify, defend and hold harmless the Company and its respective directors, officers, managers, employees and agents, from and against any and all third party claims, suits, demands, actions and proceedings, wherever brought and however denominated (any of the foregoing being referred to herein as a "Claim"), including all damages, penalties, fines, costs, expenses, liabilities and settlements in connection therewith and reasonable outside attorneys' fees and litigation expenses ("Damages") arising from or related to any breach of the Contractor's obligations or any negligence or willful misconduct under this Agreement.

4

8/10/1

**EXHIBIT H**

**11. Miscellaneous.**

11.1    All of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, if any, successors, and assigns.

11.2    The laws of the state of New York shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties hereto.

11.3    Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in New York in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

11.4    Section headings are not to be considered a part of this Agreement and are not intended to be a full and accurate description of the contents hereof.

11.5    Waiver by one party hereto of breach of any provision of this Agreement by the other shall not operate or be construed as a continuing waiver.

11.6    The Contractor shall not assign any of his or her rights under this Agreement, or delegate the performance of any of his or her duties hereunder, without the prior written consent of the Company.

11.7    Any and all notices, demands, or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party if personally served, or if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested. If such notice or demand is served personally, notice shall be deemed constructively made at the time of such personal service. If such notice, demand or other communication is given by mail, such notice shall be conclusively deemed given five days after deposit thereof in the United States mail addressed to the party to whom such notice, demand or other communication is to be given as follows:

> *If to the Contractor:*
> David David Bunevacz
> 23810 Spinnaker Court,
> Valencia, CA 91355.
>
> *If to the Company:*
> MpowerD Inc.
> 1 Little West 12th Street
> New York, NY 10014

Any party hereto may change its address for purposes of this paragraph by written notice given in the manner provided above.

11.8    No amendment, change or modification of this Agreement shall be valid unless in writing signed by the parties hereto.

5

JP

8/10/12

---

**EXHIBIT H**

**11.9**   This document and any exhibit attached constitute the entire understanding and agreement of the parties, and any and all prior agreements, understandings, and representations are hereby terminated and canceled in their entirety and are of no further force and effect.

**11.10**   If any provision of this Agreement, or any portion thereof, is held to be invalid and unenforceable, then the remainder of this Agreement shall nevertheless remain in full force and effect.

6

4/10/12

**EXHIBIT H**

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the day
and year first written above. The parties hereto agree that facsimile signatures shall be
as effective as if originals.


MpowerD Inc.


By: _____
                    [name]   Jacques-Philippe Piverger
                    [title or position]   CEO


David Bunevacz


By: _____                8/10/2012
David Bunevacz


7

EXHIBIT H

ASSIGNMENT OF RIGHTS TO AND AMENDMENT OF

PRODUCTION CONTRACTOR AGREEMENT

THIS ASSIGNMENT OF RIGHTS TO AND AMENDMENT OF PRODUCTION CONTRACTOR AGREEMENT ("Agreement") is dated as of _Marli 4/_____, 2013 between David Bunevacz, an individual ("Assignor"); Anthony Barron, an individual ("Assignee"); and MpowerD Inc., a New York Benefit Corporation ("MpowerD"), with respect to that certain Production Contractor Agreement dated August 10, 2012 by and between Assignor and MpowerD ("Development Agreement"). Assignor, Assignee and MpowerD are hereinafter collectively referred to as the "Parties". Terms not expressly defined herein shall have the meaning assigned to them in the Development Agreement.

WHEREAS, the terms of the Development Agreement provide for Assignor to facilitate the production of the Luci solar powered light ("Luci light");

WHEREAS, Assignee has expended and shall continue to expend significant efforts in assisting Assignor with the Luci light production process, including the sourcing of materials, engineering and manufacturing selection and oversight;

WHEREAS, the Assignor and Assignee desire to acknowledge the efforts of Assignee and to compensate Assignee for such efforts consistent with the terms of the Development Agreement as amended herein;

NOW THEREFORE, that in consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.  **Terms of Amendment.** The Development Agreement is hereby amended as follows:

1.1  Section 3 of the Development Agreement is hereby amended by deleting the first sentence and replacing it with the following: "The term of this Agreement shall commence upon execution of this Agreement and shall continue in full force and effect until five (5) years after the date of this Agreement, and shall automatically renew for successive one (1) year periods unless terminated by either Party as otherwise provided under Section 9.1 of this Agreement."

1.2  Section 4.1 of the Development Agreement is hereby deleted and the following is inserted in its stead:

"4.1  As full compensation for the services rendered pursuant to this Agreement, Company shall pay Contractor:

EXHIBIT H

a sum equal to $0.40 per Luci light for the first 200,000 units manufactured and shipped in accordance with instructions provided by Company during the term of this Agreement;

thereafter, a sum equal to $0.25 per Luci light manufactured and shipped in accordance with instructions provided by Company during the term of this Agreement."

1.4    Section 9.1 of the Development Agreement is hereby amended by a deletion of the first sentence set forth therein.

2.    Assignment.

2.1    Assignment of Compensation. Assignor hereby grants, transfers, conveys and assigns to Assignee a one-third (1/3) interest in and to all payments made or to be made to Assignor pursuant to Section 4.1 of the Development Agreement ("Assigned Payments").

2.2    MpowerD Consent. Pursuant to Section 11.6 of the Development Agreement, MpowerD provides its consent to the Assignment, as indicated by its signature below.

3.    Payments; Reports; Audit Rights.

3.1    Payments. Assignor shall pay Assignee the Assigned Payments within five (5) days of his receipt of same pursuant to Section 4.2 of the Development Agreement. .

3.2    Reports. Each payment made pursuant to Section 3.1 above by shall be accompanied by the quarterly report provided by Contractor to MpowerD pursuant to the Development Agreement, which report shall identify the particulars as to any and all shipments of Luci lights relating to such payment in such reasonable detail as is sufficient for Assignee to confirm the appropriateness of the compensation received

3.3    Audit Rights. Assignor shall maintain such records, information and documentation as may be reasonably required to document compliance with the terms and conditions of this Agreement, and shall exercise his best efforts to secure such records and information from the relevant manufacturer. Assignee shall have the right, at its sole cost and expense (except as otherwise provided below), to audit any and all pertinent documents, activity reports, or other records that are reasonably necessary to verify Assignor's compliance with the terms and conditions of this Agreement, including such documents, reports or other records received by Assignor from Company. Any such audit shall be performed no more than once during any calendar year, during normal business hours, and upon no less than five (5) business days advance notice. Assignor shall provide to Assignee's auditors and representatives any assistance they may reasonably require in connection with such audits and inspections. Should the audit reveal a discrepancy in Luci light units manufactured and shipped of more than five percent (5%) in favor of Assignee, then Assignor shall, in addition to paying any amounts owed to Assignee as a result of the discrepancy, pay Assignee's reasonable expenses associated with

**EXHIBIT H**

such audit. Any payments determined to be due and owing from either party to the other as a result of an audit performed pursuant to this Section 4.5 shall be paid within five (5) business days of such determination.

4.     **Effective Date.** The Parties agree that the effective date of this Agreement shall be August 10, 2012 ("Effective Date").

5.     **Term; Termination.** The term of this Agreement shall be co-extensive with the term of the Development Agreement, as that term is defined in Section 3 of the Development Agreement, unless earlier terminated pursuant to the written agreement of the Parties.

6.     **Notices.** Any and all notices required or desired to be given hereunder shall be in writing and shall be effected by personal delivery, telecopier, overnight courier service or by registered or certified mail, return receipt requested. Notices delivered personally or by telecopier or overnight courier service shall be deemed communicated as of actual receipt; mailed notices shall be deemed communicated forty-eight (48) hours after deposit in the U.S. mail, first-class postage prepaid, to be addressed as set forth below:

|  |  |
|---|---|
| "Assignor": | David Bunevacz<br>23810 Spinnaker Court<br>Valencia, CA 91355 |
| "Assignee": | Anthony Barron<br>344 Hauser Blvd., Suite 411<br>Los Angeles, CA 90036 |
| "Corporation": | Jacques-Phillipe Piveiger<br>Chief Executive Officer<br>MpowerD Inc.<br>1 Little West 12th Street<br>New York, NY 10014 |

7.     **Entire Agreement.** This Agreement, together with the Development Agreement as amended herein, contains the entire agreement between the Parties related to the subject matter hereof.

8.     **No Amendment.** No amendment hereof or supplement or other modification hereto, and no consent to, or waiver, discharge, or release of, any term or provision or breach hereof, shall be valid or effective unless such amendment, supplement, or other modification, or such consent, waiver, discharge, or release, is in writing, expressly refers hereto, and is signed by the Party to be bound thereby.

**EXHIBIT H**

9.   **No Third Party Beneficiaries.** This Agreement shall be binding upon, and inure to the benefit of the Parties and their respective successors and assigns. Nothing in this Agreement is intended to or shall create any third-party beneficiaries, whether intended or incidental.

10.   **Severability.** If any term or other provision hereof is determined by any court of competent jurisdiction to be invalid, illegal, or unenforceable in whole or in part by reason of any applicable law or public policy, and such determination becomes final and non-appealable, such term or other provision shall remain in full force and effect to the fullest extent permitted by law, and all other terms and provisions hereof shall remain in full force and effect in their entirety.

11.   **Mutual Cooperation.** The Parties shall promptly take such actions and execute such documents as may be reasonably necessary and/or appropriate to carry out the terms and the intent of this Agreement.

12.   **Attorney Fees.** In the event that it becomes necessary for any Party to obtain the services of any attorney to enforce the provisions of this Agreement against another Party who has breached any obligation hereunder, or who is in default under the provisions hereof, the defaulting Party shall pay the reasonable attorney's fees of the non-defaulting Party. In the event of any action for breach of or to enforce the provisions of this Agreement, the prevailing Party shall be entitled to recover from the unsuccessful Party reasonable attorney's fees, costs, disbursements and other litigation expenses in such amounts as may be awarded by a court of competent jurisdiction.

13.   **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

14.   **Counterparts.** This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts, each of which when executed shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart hereof via facsimile shall be as effective as delivery of a manually executed counterpart hereof.

IN WITNESS WHEREOF the Parties have executed this Agreement as of the date first referenced above.

[Signature on following page]

**EXHIBIT H**

## Production Contractor Agreement

This Agreement is entered into as of the ___10___ day of __August__, 20_21_, between MpowerD Inc., a New York Benefit Corporation ("the Company") at 1 Little West 12th Street, New York, NY 10014 and DAVID BUNEVACZ ("the Contractor") at 23810 Spinnaker Court, Valencia, CA 91355.

### RECITALS

Company is engaged in the business of creating solar lights.

Whereas, the Contractor has provided significant service to Company in the planning, research, development and manufacturing process for the Luci solar powered light.

Whereas, the Contractor desires to continue to facilitate the production process of the Luci solar powered light.

**NOW, THEREFORE**, in consideration of the above recitals and the mutual promises and conditions contained in this Agreement, the Parties agree as follows:

**1. Independent Contractor.**

1.1    Subject to the terms and conditions of this Agreement, the Company hereby engages the Contractor as an independent contractor to perform the services set forth herein, and the Contractor hereby accepts such engagement. This Agreement does not constitute a hiring by either party. This Agreement shall not render the Contractor an employee, partner, agent of, or joint venturer with the Company for any purpose. The Contractor is and will remain an independent contractor in his or her relationship to the Company. The Company shall not be responsible for withholding taxes with respect to the Contractor's compensation hereunder. The Contractor shall have no claim against the Company hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind.

1.2    The Contractor shall have an independent contractor status and not be an employee for any purposes, including, but not limited to, the application of the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, the provisions of the Internal Revenue Code, the State Revenue and Taxation Code relating to income tax withholding at the source of income, the Workers' Compensation Insurance Code 401(k) and other benefit payments and third party liability claims. The Contractor shall retain sole and absolute discretion in the manner and means of carrying out their activities and responsibilities under this Agreement. This Agreement shall not be considered or construed to be a partnership or joint venture, and the Company shall not be liable for any obligations incurred by the Contractor unless specifically authorized in writing. The Contractor shall not act as an agent of the Company, ostensibly or otherwise, nor bind the Company in any manner, unless specifically authorized to do so in writing.

1

8/10/12

**1.3**    All expenses related to the contractor's services under this Agreement shall be borne by the Contractor, not the Company.

## 2. Scope of Services.

**2.1**    The Contractor shall manage quality control for the production and manufacturing of the Luci solar light. Company and Contractor shall set forth mutual agreed upon standards for quality ("Quality Standards") (e. g. description, specifications, data sheets, drawings, product samples). The Contractor shall ensure that the manufacturer is in compliance with the Quality Standards, and take the necessary action to communicate any non-compliance with Quality Standards, as well as take action to ensure swift and accurate compliance with Quality Standards at any stage of the production and manufacturing process.

**2.2**    The Contractor shall manage inventory security by ensuring that all Luci solar lights make it from the manufacturer to Company, and/or its distributors and affiliates in proper working condition without damage of any kind.

**2.3**    The Contractor shall manage the production process of Luci solar lights. Contractor shall lead the production process and act on behalf of the company to communicate with the manufacturer at every stage of the production and manufacturing process. Contractor, shall however gain permission of Company for any material decisions in the production and manufacturing process.

**2.4**    The Contractor shall provide Company with regular updates and general advice as to the production and manufacturing process.

## 3. Term.

This engagement shall commence upon execution of this Agreement and shall continue in full force and effect until two years after the date of this Agreement. The Agreement may only be extended thereafter by mutual agreement, unless terminated earlier by operation of and in accordance with this Agreement.

## 4. Compensation.

**4.1**    As full compensation for the services rendered pursuant to this Agreement, the Company shall pay the Contractor:

> a sum equal to $0.40 per Luci light for the first 200,000 units sold during the term of this agreement;

> thereafter, a sum equal to $0.25 per Luci light sold by the Company during the term of this agreement.

2

*JP*

*8/10/12*

4.2    Company shall make the above payments to Contractor on a quarterly basis by the 10th day of January, April, July and September.

4.3    Company shall have no obligation to pay Contractor for sales occurring after the term of this Agreement.

## 5. Written Reports.

5.1    : Contractor shall compile a quarterly written report for the Company consisting of number of units produced, manufacturer, cost of units produced, cost of components and raw materials as well as any other information Company shall reasonably request.

## 6. CONFIDENTIAL INFORMATION

6.1    Each Party agrees and undertakes that during the term of this Agreement and thereafter it shall keep confidential and shall not use for its own purposes all information of a confidential nature (including, without limitation, information relating to a Party's business, know-how, processes, product information and trade secrets) which may become known to that Party from the other Party ("Confidential Information"),

6.2    Either Party's Confidential Information shall be maintained in strictest confidence by the other Party and shall be treated as the other Party would treat its own Confidential Information. It may only be used for the sole purpose of assisting that other Party in adequately discharging its obligations hereunder. Such Confidential Information shall not be disclosed to any third party, without prior written consent from the other Party or unless required by local law. This obligation shall survive the termination of this Agreement for seven (7) years from the end of the contract.

## 7. Covenant to Not Compete:

7.1    The Contractor hereby agrees that during the course of the Agreement and for a period of twenty four months immediately following the expiration or termination of the Agreement for any reason, whether with or without good cause or for any or no cause, at the option either of the Company or the Independent Contractor, with or without notice, the Independent Contractor will not compete with the Company and its successors and assigns, without the prior written consent of the Company.

The term "not compete" as used herein shall mean that the Independent Contractor shall not, without the prior written consent of the Company, (i) serve as a partner, employee, Company, officer, director, manager, agent, associate, investor, or otherwise for, (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate with, any business in competition with or otherwise similar to the Company's business.

This shall cover the Independent Contractor's activities in every part of the Territory in which the Independent Contractor may conduct business during the term of the

3

8/10/02

Agreement as set forth above. "Territory" shall mean (i) all counties in the State of New York, (ii) all other states of the United States of America and (iii) all other countries of the world; provided that, with respect to clauses (ii) and (iii) in this paragraph, the Company derives at least five percent (5%) of its gross revenues from such geographic area prior to the date of the expiration or termination of the Agreement. The Independent Contractor further acknowledges the time, geographic, and scope limitations of his or her obligations are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that he or she will not be precluded from gainful employment if he or she is obligated not to compete with the Company during the period and within the Territory.

### 8. Right to Injunction.

8.1     The parties hereto acknowledge that the services to be rendered by the Contractor under this Agreement and the rights and privileges granted to the Company under the Agreement are of a special, unique, unusual, and extraordinary character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in any action at law, and the breach by the Contractor of any of the provisions of this Agreement will cause the Company irreparable injury and damage. The Contractor expressly agrees that the Company shall be entitled to injunctive and other equitable relief in the event of, or to prevent, a breach of any provision of this Agreement by the Contractor. Resort to such equitable relief, however, shall not be construed to be a waiver of any other rights or remedies that the Company may have for damages or otherwise. The various rights and remedies of the Company under this Agreement or otherwise shall be construed to be cumulative, and no one of the them shall be exclusive of any other or of any right or remedy allowed by law.

### 9. Termination.

9.1     The Company may terminate this Agreement at any time by 10 working days' written notice to the Contractor. In addition, if the Contractor is convicted of any crime or offense, fails or refuses to comply with the legal or ethical standards, written policies or reasonable directive of the Company, is guilty of serious misconduct in connection with performance hereunder, or materially breaches provisions of this Agreement, the Company at any time may terminate the engagement of the Contractor immediately and without prior written notice to the Contractor.

### 10. Indemnification.

10.1     Contractor shall indemnify, defend and hold harmless the Company and its respective directors, officers, managers, employees and agents, from and against any and all third party claims, suits, demands, actions and proceedings, wherever brought and however denominated (any of the foregoing being referred to herein as a "Claim"), including all damages, penalties, fines, costs, expenses, liabilities and settlements in connection therewith and reasonable outside attorneys' fees and litigation expenses ("Damages") arising from or related to any breach of the Contractor's obligations or any negligence or willful misconduct under this Agreement.

4

8/10/1

**EXHIBIT H**

**11. Miscellaneous.**

11.1    All of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, if any, successors, and assigns.

11.2    The laws of the state of New York shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties hereto.

11.3    Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in New York in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

11.4    Section headings are not to be considered a part of this Agreement and are not intended to be a full and accurate description of the contents hereof.

11.5    Waiver by one party hereto of breach of any provision of this Agreement by the other shall not operate or be construed as a continuing waiver.

11.6    The Contractor shall not assign any of his or her rights under this Agreement, or delegate the performance of any of his or her duties hereunder, without the prior written consent of the Company.

11.7    Any and all notices, demands, or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party if personally served, or if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested. If such notice or demand is served personally, notice shall be deemed constructively made at the time of such personal service. If such notice, demand or other communication is given by mail, such notice shall be conclusively deemed given five days after deposit thereof in the United States mail addressed to the party to whom such notice, demand or other communication is to be given as follows:

> *If to the Contractor:*
> David David Bunevacz
> 23810 Spinnaker Court,
> Valencia, CA 91355.
>
> *If to the Company:*
> MpowerD Inc.
> 1 Little West 12th Street
> New York, NY 10014

Any party hereto may change its address for purposes of this paragraph by written notice given in the manner provided above.

11.8    No amendment, change or modification of this Agreement shall be valid unless in writing signed by the parties hereto.

5

JP

8/10/12

**EXHIBIT H**

**11.9**   This document and any exhibit attached constitute the entire understanding and agreement of the parties, and any and all prior agreements, understandings, and representations are hereby terminated and canceled in their entirety and are of no further force and effect.

**11.10**   If any provision of this Agreement, or any portion thereof, is held to be invalid and unenforceable, then the remainder of this Agreement shall nevertheless remain in full force and effect.

6

4/10/12

**EXHIBIT H**

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the day and year first written above. The parties hereto agree that facsimile signatures shall be as effective as if originals.

MpowerD Inc.

By: _____
[name]   Jacques-Philippe Piverger
[title or position]   CEO

David Bunevacz

By: _____                   8/10/2012
David Bunevacz

7

**EXHIBIT H**

ASSIGNMENT OF RIGHTS TO AND AMENDMENT OF

PRODUCTION CONTRACTOR AGREEMENT

THIS ASSIGNMENT OF RIGHTS TO AND AMENDMENT OF PRODUCTION CONTRACTOR AGREEMENT ("Agreement") is dated as of _March 4_ , 2013 between David Bunevacz, an individual ("Assignor"); Anthony Barron, an individual ("Assignee"); and MpowerD Inc., a New York Benefit Corporation ("MpowerD"), with respect to that certain Production Contractor Agreement dated August 10, 2012 by and between Assignor and MpowerD ("Development Agreement"). Assignor, Assignee and MpowerD are hereinafter collectively referred to as the "Parties". Terms not expressly defined herein shall have the meaning assigned to them in the Development Agreement.

WHEREAS, the terms of the Development Agreement provide for Assignor to facilitate the production of the Luci solar powered light ("Luci light");

WHEREAS, Assignee has expended and shall continue to expend significant efforts in assisting Assignor with the Luci light production process, including the sourcing of materials, engineering and manufacturing selection and oversight;

WHEREAS, the Assignor and Assignee desire to acknowledge the efforts of Assignee and to compensate Assignee for such efforts consistent with the terms of the Development Agreement as amended herein;

NOW THEREFORE, that in consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

I.      Terms of Amendment. The Development Agreement is hereby amended as follows:

1.1     Section 3 of the Development Agreement is hereby amended by deleting the first sentence and replacing it with the following: "The term of this Agreement shall commence upon execution of this Agreement and shall continue in full force and effect until five (5) years after the date of this Agreement, and shall automatically renew for successive one (1) year periods unless terminated by either Party as otherwise provided under Section 9.1 of this Agreement."

1.2     Section 4.1 of the Development Agreement is hereby deleted and the following is inserted in its stead:

"4.1    As full compensation for the services rendered pursuant to this Agreement, Company shall pay Contractor:

**EXHIBIT H**

a sum equal to $0.40 per Luci light for the first 200,000 units manufactured and shipped in accordance with instructions provided by Company during the term of this Agreement;

thereafter, a sum equal to $0.25 per Luci light manufactured and shipped in accordance with instructions provided by Company during the term of this Agreement."

1.4    Section 9.1 of the Development Agreement is hereby amended by a deletion of the first sentence set forth therein.

2.    Assignment.

2.1    Assignment of Compensation.  Assignor hereby grants, transfers, conveys and assigns to Assignee a one-third (1/3) interest in and to all payments made or to be made to Assignor pursuant to Section 4.1 of the Development Agreement ("Assigned Payments").

2.2    MpowerD Consent.  Pursuant to Section 11.6 of the Development Agreement, MpowerD provides its consent to the Assignment, as indicated by its signature below.

3.    Payments; Reports; Audit Rights.

3.1    Payments.  Assignor shall pay Assignee the Assigned Payments within five (5) days of his receipt of same pursuant to Section 4.2 of the Development Agreement.

3.2    Reports.  Each payment made pursuant to Section 3.1 above by shall be accompanied by the quarterly report provided by Contractor to MpowerD pursuant to the Development Agreement, which report shall identify the particulars as to any and all shipments of Luci lights relating to such payment in such reasonable detail as is sufficient for Assignee to confirm the appropriateness of the compensation received

3.3    Audit Rights.  Assignor shall maintain such records, information and documentation as may be reasonably required to document compliance with the terms and conditions of this Agreement, and shall exercise his best efforts to secure such records and information from the relevant manufacturer.  Assignee shall have the right, at its sole cost and expense (except as otherwise provided below), to audit any and all pertinent documents, activity reports, or other records that are reasonably necessary to verify Assignor's compliance with the terms and conditions of this Agreement, including such documents, reports or other records received by Assignor from Company.  Any such audit shall be performed no more than once during any calendar year, during normal business hours, and upon no less than five (5) business days' advance notice.  Assignor shall provide to Assignee's auditors and representatives any assistance they may reasonably require in connection with such audits and inspections.  Should the audit reveal a discrepancy in Luci light units manufactured and shipped of more than five percent (5%) in favor of Assignee, then Assignor shall, in addition to paying any amounts owed to Assignee as a result of the discrepancy, pay Assignee's reasonable expenses associated with

**EXHIBIT H**

such audit. Any payments determined to be due and owing from either party to the other as a result of an audit performed pursuant to this Section 4.5 shall be paid within five (5) business days of such determination.

4.   **Effective Date.** The Parties agree that the effective date of this Agreement shall be August 10, 2012 ("Effective Date").

5.   **Term; Termination.** The term of this Agreement shall be co-extensive with the term of the Development Agreement, as that term is defined in Section 3 of the Development Agreement, unless earlier terminated pursuant to the written agreement of the Parties.

6.   **Notices.** Any and all notices required or desired to be given hereunder shall be in writing and shall be effected by personal delivery, telecopier, overnight courier service or by registered or certified mail, return receipt requested. Notices delivered personally or by telecopier or overnight courier service shall be deemed communicated as of actual receipt; mailed notices shall be deemed communicated forty-eight (48) hours after deposit in the U.S. mail, first-class postage prepaid, to be addressed as set forth below:

"Assignor":     David Bunevacz
                23810 Spinnaker Court
                Valencia, CA 91355

"Assignee":     Anthony Barron
                344 Hauser Blvd., Suite 411
                Los Angeles, CA 90036

"Corporation":  Jacques-Phillipe Piveiger
                Chief Executive Officer
                MpowerD Inc.
                1 Little West 12th Street
                New York, NY 10014

7.   **Entire Agreement.** This Agreement, together with the Development Agreement as amended herein, contains the entire agreement between the Parties related to the subject matter hereof.

8.   **No Amendment.** No amendment hereof or supplement or other modification hereto, and no consent to, or waiver, discharge, or release of, any term or provision or breach hereof, shall be valid or effective unless such amendment, supplement, or other modification, or such consent, waiver, discharge, or release, is in writing, expressly refers hereto, and is signed by the Party to be bound thereby.

**EXHIBIT H**

9.   **No Third Party Beneficiaries.** This Agreement shall be binding upon, and inure to the benefit of the Parties and their respective successors and assigns. Nothing in this Agreement is intended to or shall create any third-party beneficiaries, whether intended or incidental.

10.   **Severability.** If any term or other provision hereof is determined by any court of competent jurisdiction to be invalid, illegal, or unenforceable in whole or in part by reason of any applicable law or public policy, and such determination becomes final and non-appealable, such term or other provision shall remain in full force and effect to the fullest extent permitted by law, and all other terms and provisions hereof shall remain in full force and effect in their entirety.

11.   **Mutual Cooperation.** The Parties shall promptly take such actions and execute such documents as may be reasonably necessary and/or appropriate to carry out the terms and the intent of this Agreement.

12.   **Attorney Fees.** In the event that it becomes necessary for any Party to obtain the services of any attorney to enforce the provisions of this Agreement against another Party who has breached any obligation hereunder, or who is in default under the provisions hereof, the defaulting Party shall pay the reasonable attorney's fees of the non-defaulting Party. In the event of any action for breach of or to enforce the provisions of this Agreement, the prevailing Party shall be entitled to recover from the unsuccessful Party reasonable attorney's fees, costs, disbursements and other litigation expenses in such amounts as may be awarded by a court of competent jurisdiction.

13.   **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

14.   **Counterparts.** This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts, each of which when executed shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart hereof via facsimile shall be as effective as delivery of a manually executed counterpart hereof.

IN WITNESS WHEREOF the Parties have executed this Agreement as of the date first referenced above.

[Signature on following page]

**EXHIBIT H**

"Assignor"

David Buncyacz

"Assignee"

Anthony Barron

MpowerD Inc.,
a New York Benefit Corporation

By:
Jacques-Philippe Piverger
Chief Executive Officer

**EXHIBIT H**